The insolvent corporation was organized for the purpose of constructing and operating an apartment house in the city of Wilmington. In order to finance the construction, it made application to Integrity Trust Company for a mortgage loan. The loan was granted in the amount of $237,500, and was secured by a mortgage dated and recorded on March 7, 1929. The premises described in the mortgage are the same land which the receiver has sold and the proceeds from the sale of which are now in hand subject to such disposition as the court may order.
At the time the mortgage was given, the apartment house was yet to be built. A building operation agreement was entered into by which it was agreed between the mortgagor and mortgagee that the proceeds of the mortgage should be deposited with the mortgagee (which carried on a banking business), and credited to the building operation; and further that the moneys so credited "shall be applied and are hereby irrevocably appropriated to the payment of indebtedness of party of the first part (mortgagor) to party of second part (mortgagee) and to the payment of debts contracted for, in and about the erection and construction of the said building." The agreement then proceeds to provide that the deposited moneys "shall be disbursed or paid out from time to time to the several contractors and mechanics, directly, for work actually done and for materials actually furnished in and about the erection and construction of the said buildings * * * upon orders or vouchers only, signed by the said party of the first part (mortgagor), or his duly constituted attorney-in-fact, herein and countersigned by the proper officers of the said party of the second part (mortgagee), * * * etc."
A so-called settlement sheet, dated March 12, 1929, prepared by the Trust Company and signed by the president of Denbigh Hall Incorporated, shows the sum of $237,500, the amount of the loan, to have been deposited by the mortgagor with the Trust Company. Appropriate entries were made by the Trust Company in its own books showing a credit to Denbigh Hall Incorporated of the same amount. Thereafter the Trust Company, from time to time as the requirements of the construction demanded, transferred to Denbigh Hall Incorporated Building Operation Cash Account from the sum so credited to Denbigh Hall Incorporated, various sums which were disbursed on vouchers in accordance with the agreement in payment of work done and materials furnished for the building. The first of such transfers is shown by the Building Operation Cash Account to have occurred on March 28, 1929. Since then, all but a few hundred dollars of the total credit of $237,500 has been duly transferred to the cash account above referred to and paid out on vouchers on account of the construction costs.
It is apparent from the foregoing statement of facts that the mortgage in question was what is known as a building construction mortgage. The mortgage on its face is a straight mortgage. It purports to show a present obligation for money advanced in the sum of $237,500. While on the date of the mortgage this sum had not been actually advanced, yet the understanding of the parties entered into under date of a few days later shows that the mortgagee was obligated to advance the sum. The acts of the parties were in accordance with this understanding. The amount of the loan was in fact immediately credited by the Trust Company to the borrower's loan account and as before stated it was thence transferred to the borrower's Building Operation Cash Account from which it was checked out on the borrower's orders to pay for construction bills.
The mortgage was therefore not one under which the mortgagee retained an option to make future advances. When a construction mortgage is of that type, there are authorities which hold that the priority of the mortgage as to future advances over liens entered subsequently to its recording, is affected by the presence or absence of actual notice to the mortgagee of the existence of the subsequent liens. See 3 Pomeroy's Equity Jurisprudence (4th Ed.) § 1198 et seq. The case of Ackerman v. Hunsicker et al., 85 N. Y. 43, 39 Am. Rep. 621, upon which the mechanics' lien claimants rely, belongs to this class of authorities. The instant case does not, however, call for a consideration of the question *Page 132 
which those authorities present, for this is not a case of optional advances.
In the instant case, various mechanics' lien claimants contend that their liens have priority of rank over the Integrity Trust Company's mortgage. In this State a mechanic's lien takes rank according to the time when the work and labor was begun or the furnishing of materials was commenced. Revised Code 1915, § 2843. In the case of every mechanic's lien claimant here concerned, it appears that the labor was begun or the furnishing of materials commenced not only after the mortgage was dated and recorded but as well also after the amount secured by it was actually placed by the mortgagee to the credit of the mortgagor.
The mechanic's lien created by the Delaware statute, unlike the lien created by statute in some of the American states, gives to the lienors a priority only over liens and encumbrances obtained subsequently to the beginning of the work or the commencing of the furnishing of materials. France v. Woolston, 4 Houst. 557. If the act of the Trust Company mortgagee of placing the full amount of the mortgage to the credit of the mortgagor on or about March 12, 1929, subject to disbursements on the mortgagor's orders, can be said to constitute an advancement at that time of the entire loan, as its solicitors contend and I am inclined to agree, then the loan was fully advanced ahead of all the mechanics' lien claims, and the latter would be clearly junior to the mortgage.
[1] But even if the view be taken that the facts do not warrant the conclusion that the entire sum was advanced at the outset as just stated, yet the facts leave no room to doubt that in any event the mortgagee was irrevocably bound to make advances from time to time up to the full amount named in the mortgage. It had no option in the matter. Taking this as the true aspect of the matter for the moment, the case is one therefore where a straight mortgage for $237,500 was given and recorded to secure future advancements from time to time aggregating that sum with a definite obligation on the part of the mortgagee to make such advancements. The fact that the mortgage did not on its face disclose that the loan was to be thus laid out in future obligatory installments, can in no wise vitiate the validity of the mortgage or its lien. 3 Pomeroy's Equity Jurisprudence (4th Ed.) § 1197; Kentucky Lumber Mill Work Co. v. Kentucky Title Savings Bank Trust Co., 184 Ky. 244,211 S. W. 765, 5 A. L. R. 391.
[2, 3] Where a construction mortgage is for a specified sum which the mortgagee is obligated to advance in installments in the future, and the law governing mechanics' liens is similar to that which is found in this jurisdiction, the decided weight of authority is to the effect that the mortgage lien is a valid one from the date of its recordation and takes priority accordingly to the extent of the advancements made over liens for work and labor done and materials furnished after the date of its recording. Smith v. Anglo-California Trust Co., 205 Cal. 496,271 P. 898; Boise Payette Lumber Co. v. Winward, 47 Idaho, 485, 276 P. 971; Platt v. Griffith et al., 27 N. J. Eq. 207; Micele v. Falduti,101 N. J. Eq. 103, 137 A. 92; Kingsport Brick Corp. v. Bostwick, 145 Tenn. 19,235 S. W. 70; cases collected in the annotation found in 5 A. L. R. 398. Nor, as is shown in some of these cases, is the operation of the principle they establish affected by the circumstance that the mortgagee had notice at the time of making an advancement that mechanics and material men were working on and supplying materials for the construction and would therefore have the right to file liens against the premises. See also Gray v. McClellan, 214 Mass. 92, 100 N. E. 1093; Brinkmeyer v. Helbling, 57 Ind. 435; Rowan v. Sharps' Rifle Mfg. Co., 29 Conn. 282. The Indiana and Connecticut cases just cited presented a rivalry of claim against the priority of a first mortgage to secure obligatory future advances on the part of second mortgagees, notice of whose liens was had by the first mortgagee before some of the advancements were made. Those cases would therefore appear to be stronger in their facts against the first mortgagee than is the case sub judice, for here the subsequent lienors do not show actual notice to the mortgagee of judgments actually obtained before advancements were made. The most they show is notice to the mortgagee that judgments might be obtained. The English case of Hopkinson v. Holt, 9 H. L. Cas. 514, 25 Beav. 461, appears to be in conflict with the rule adopted in the Indiana and Connecticut cases just cited. The editor of the 4th edition of Pomeroy's Equity Jurisprudence in a note to § 1199, however, expresses the opinion that the latter cases are based upon the true principle and formulate the correct doctrine.
[4] The solicitors for the mechanics' lien claimants make the statement on their brief that the mortgagee agreed that it would make payments out of the mortgage money to and for the sole use and benefit of persons who worked on the building or who furnished materials for its construction, and, he argues, a sort of fiduciary obligation to the workmen and materialmen was thereby assumed by the mortgagee whereby it was bound to see to it that the fund was so disbursed. If by this they mean to fasten upon the mortgagee the character of a trustee owing a duty to the workmen and materialmen to see that they were paid in full, I am unable to agree with *Page 133 
their contention. The arrangement was one solely between the mortgagor and mortgagee and designed exclusively for the mortgagee's protection. Certainly the mortgagee assumed no obligation to the mortgagor to pay all of the latter's construction costs. A fortiori, the mortgagee assumed no such obligation to the persons who contracted with the mortgagor for labor and materials. But assuming a fiduciary duty on the part of the mortgagee to see to it that the mortgage money was spent on account of the construction, the fact is that every dollar of it was so spent.
[5-7] The item of $11,875 which the insolvent corporation's books describe as a bonus paid to the mortgagee for the loan, if it was such, was paid not out of the face of the mortgage, but was taken out of a cash payment of $51,584.14 made by the mortgagor at the settlement date of the mortgage transaction. The full amount of the mortgage, viz., $237,-500 (less a few hundred dollars for which the mortgagor still has a credit) was paid out in construction costs. The unfortunate part of the matter is that this amount fell short of covering the entire cost of the project.
Mention was just made of an item of $11,- 875. The facts touching it are as follows. When the mortgage arrangements were settled, and before the Trust Company advanced the money, it insisted that certain costs should be paid by the mortgagor. These included "all the usual costs and expenses of the transaction, such as premium on bond, fire insurance, title insurance premiums and searches, Title Company's fee for special insurance for completion and against liens, and the like." This agreement was embodied in the borrower's application for the loan. When the loan settlement was made, five per cent. ($11,875) of the face of the loan was, in accordance with the previous agreement, paid by the mortgagor. The five per cent. was made up of two per cent. for mechanics' lien insurance, one Per cent. for completion insurance and two per cent. for service charges to defray the costs and expenses of the Trust Company in handling the building operation account in the course of the operations. The sum thus paid was a part of a total cash payment of $51,584.14 which the mortgagor obtained from a source other than the mortgagee.
The foregoing are the facts which the evidence discloses. The mortgage was to run for only one year and it appears from the evidence that the operation was intended to be permanently financed by another and permanent mortgage. The purchaser of such final mortgage would, it was anticipated, demand an insurance against liens. The mortgagee Trust Company was engaged in the business of temporarily financing construction operations. Such an operation involved the placing of the loan in other hands on a longer time security — the placing of what the parties called a permanent loan. The purchaser of such a loan on a recently completed building would naturally desire to be insured against mechanics' liens. The Trust Company as one of its business activities was prepared to issue such insurance. In order to facilitate the negotiating of the permanent loan by its own readiness to insure against mechanics' liens on the new structure, it demanded from the borrower the two per cent. charge referred to as its compensation for lien insurance which it expected to be called upon to issue. I can see nothing in this state of facts which indicates that the two per cent. charge for mechanics' lien insurance was a device for cloaking an usurious intent. As to the one per cent. charge for completion insurance — the legitimate propriety thereof seems to me to be apparent. And I can see no lawful impropriety in the charge of two per cent. to defray the costs and expenses of the mortgagee in handling the building operation account with all of its details.
[8, 9] It is of course true that no form of innocent appearance will be allowed to disguise an usurious intent. The law will disregard all appearances and appraise the transaction in the light of its essential nature. It is however entirely proper for a lender of money to exact from the borrower that he bear certain agreed expenses in addition to the obligation to pay a lawful interest charge, without rendering the contract usurious. 27 R. C. L. 231; 39 Cyc. 981. The additional charge of five per cent. to cover the items specified is not shown by the evidence to have been a mere ruse for the concealment of an usurious intent. On the contrary, all the evidence bearing upon the matter tends to show that the charge was a regular one intended to cover, as it did in fact, services and expenses which it was reasonable for the borrower to bear.
Whether the solicitors for the mechanics' lien claimants mean to attack the item of $11,875 as evidential of usury or whether they mean simply to make the point against it that mortgage money in that amount was not in fact advanced, is not entirely clear to me. But on either theory the item can have no adverse effect on the mortgagee's claim because, as already pointed out, neither is it usurious in character, nor was it paid out of the mortgage money.
[10] The conclusion is then that the mortgage lien of the Integrity Trust Company outranks the mechanics' lien claims, and the proceeds of the sale should be first applied to its payment.
Order accordingly.
 *Page 428