### THOMAS v. COFFIN et al.

(Circuit Court of Appeals, Fifth Circuit. June 12, 1894.)

#### No. 206.

USURY—EFFECT ON CONTRACT—NEW AGREEMENT NOT USURIOUS.

Parties to a loan, on charges of usury therein by the borrower, agreeing that the contracts on which it had been made should be purged from any usury, struck out every item claimed at the time to be usurious, and a final balance was determined, and a new contract entered into, providing for conveyance to the lenders of the securities for the loan, and a mutual general release was executed. *Held* that, under the law of New York, any usury in the contracts was purged by the mutual agreement of the parties; and if there was any mistake or omission the borrower should not be allowed, in equity, to set it up after permitting large additional expenditures by the lenders on the strength of the new contract, with no offer to refund any portion of the amount honestly due.

Appeal from the Circuit Court of the United States for the Northern District of Georgia.

This was a suit by Coffin, Stanton, and Street, doing business under the name of Coffin & Stanton, against W. B. Thomas, to restrain him from interference with their ownership of certain stock and bonds. The circuit court rendered a decree for complainants. Defendant appealed.

W. B. Thomas, Gregory Smith, and H. T. Smith, for appellant.

Alex. C. King and Jack J. Spalding, for appellees.

Before PARDEE and McCORMICK, Circuit Judges, and LOCKE, District Judge.

LOCKE, District Judge. This suit was commenced in the court below by Coffin, Stanton, and Street, citizens of New York, and doing business under the name of Coffin & Stanton, alleging that they were the owners of 3,940 shares out of total capital stock of 4,000 shares of the capital stock of the Blue Ridge & Atlantic Railroad Company, a railroad situated in Georgia, and also owners of 300 first mortgage bonds of said road, and that one W. B. Thomas, a citizen of Georgia, who had been by them appointed manager of said road, had been endeavoring to perpetuate his control of

said road, and had repudiated the contract by which he had sold said shares and bonds to them, and was attempting to convey said shares and bonds to another party, and put a cloud upon the title of such shares and bonds, and praying that he be enjoined from interfering with their ownership thereof.

The history of the case is that the appellant, W. B. Thomas, being the owner of the above-stated shares of stock and bonds of the said railroad company, and the president of it, and desiring to borrow money for the purpose of paying off an existing lien and further improving the property, made application to appellees, Coffin & Stanton, of New York, in March, 1889, for a loan, to be secured by a deposit of the aforesaid shares of stock and bonds, and procured from them a loan of $30,000, purporting to be procured from the Loan & Investment Company a corporation of West Virginia, incorporated for the purpose of loaning money, and for which Coffin & Stanton were acting as brokers he giving a note therefor in the name of the said railroad company. For this loan he was to pay 6 per cent. interest, and Coffin & Stanton 5 per cent. commission for procuring it. The complainants subsequently advanced him $12,000 more and when the debt became due extended it for another year, they charging $15,000 commissions and he giving them in addition twenty-five $1,000 bonds of the railroad company, and a note for $75,000 to the Loan & Investment Company. Coffin, complainant, testifies that the commissions were charged and the bonds given at the urgent solicitation of the appellant, Thomas, who was desirous of giving appellees a portion of the profits that he was anticipating making from a sale of the property then in contemplation. The same stock and remaining 275 bonds were left as a security on the loan; and Thomas agreed if at any time more security was required he would furnish it. In December a demand was made for further security, and, after some discussion, he charged that the contracts were invalid, as tainted with usury, but stated, in effect, that he did not desire to take advantage of that defense, and was willing to do what was right. The result, as appears from a careful examination of all the testimony, was that after considerable negotiation it was agreed that the contracts should be purged from any usury, and a final one entered into. In accordance with this understanding, the amount of the indebtedness was reduced from something over $75,000 to about $63,000, purging out all that was at the time claimed to be usury and a final balance determined, the 25 bonds restored to the fund and an agreement in two parts, or two agreements, in writing, entered into the 17th of March, 1891, signed by Thomas and Coffin & Stanton. The first of these agreements, after reciting the negotiations which had been had between the parties stated that as it was the intention of the parties to provide by this agreement for the full compromise and adjustment of all manner of claims, disputes, and controversies growing out of these transactions, Thomas bargained, sold, and conveyed to Coffin & Stanton all the right, title, and interest that he held in the railroad company, and its property of any description, and in

the shares of stock and bonds relating thereto. He furthermore agreed to procure the resignations of the present board of directors, and the election of such persons as Coffin & Stanton might designate, and that Coffin & Stanton should pay Thomas $3,000 in equal monthly installments of $250 each, and that there should be good and sufficient deeds and instruments of conveyances executed by him, and releases from the Loan & Investment Company. It was further provided that Stanton should be elected president of the railroad company, and that Thomas should be appointed and designated as manager of the railroad for 12 months at a salary of $125 a month, to continue for the 12 months whether he should cease to act as manager or not; and that Thomas should have the power and authority to enter into contracts for sale of the shares of stock and the bonds of the road at any time within 12 months for any price not less than the amount of the indebtedness determined then to be due, together with interest and such expenditures as shall have been made upon the road in the meantime, he to have one-half of all that could be procured at such sale above such amount. He also had the power, as the attorney of Coffin & Stanton, to sell the road at public outcry at Atlanta, Ga., for any amount not less than the amount of the indebtedness due at any time within the year. If Coffin & Stanton could effect a sale during the year, they were to do so, but not to sell at a price less than approved by Thomas, and he was to have half of all that was received more than the debt and expenses. The next day—March 18th—they also entered into a further agreement, in which they mutually released and fully acquitted each other "of and from all and every manner of claim and demand of any kind whatsoever growing out of any transaction from the beginning of the world to the present time," saving inviolate the provisions of the contract of the previous day. The $3,000 was paid Thomas; also the $1,500 salary; but before the year had elapsed Thomas procured the commencement of a suit against the road in a court of the state of Georgia, and the appointment of a receiver to take possession of it, repudiated the agreement of March 17, 1891, and informed Coffin & Stanton that he had made an assignment for the benefit of his creditors, and included among the assets the Blue Ridge & Atlantic Railroad, but proposing to them that he would, for a further loan of $3,000, assign and convey to them in fee simple all his right, title, and interest to the railroad and the shares of stock and bonds. They refused his proposition for a further loan, and filed their bill for the purposes heretofore stated. Upon a hearing the court below found that the contract of March 17, 1891, was valid and binding, and free from any defect, and that Coffin & Stanton acquired thereunder the shares of stock and bonds; that they and Thomas executed mutual release from all manner of liability excepting of that agreement, and that Thomas had not presented a purchaser under that contract, nor tendered nor offered to pay them any sum of money for said stock and bonds; that Thomas had executed a deed of assignment to one A. H. Hodgson, and endeavored to convey thereby said stock and bonds, but that said deed of assignment

never took effect. And it was adjudged that the deed of assign-ment should be set aside, and decreed to be null and void, and that Thomas be enjoined from interfering with the possession or ownership of said stock and bonds or railroad, and that the con-tract of March 17, 1891, be decreed valid and binding, and that the receiver in charge, upon the payment of the costs and fees due, surrender the property to the president and directors of the railroad company. From this decree an appeal was taken, and six assignments of error stated, each one being based upon the allega-tion that the contract of March 17, 1891, was void by reason of usury. The only defense to the suit is the usury which is alleged to have entered into the final contract of settlement by which Thomas conveyed to Coffin & Stanton the stock and bonds of the railroad upon the consideration of the amounts then due, of the further payment of $3,000 in monthly installments, the salary of $1,500, and the right and privilege which he was given of finding a purchaser, or selling the road at public auction in Atlanta, within a year, and having one-half of the net proceeds after the payment of the road's indebtedness. To this defense the complainants urge first that Coffin & Stanton were private bankers, doing business in New York, and that the forfeiture of the loan did not attach to them, but, under chapter 409 of the Acts of 1882, the only penalty was the forfeiture of twice the amount of interest collected, upon suit brought within two years; second, that the first transaction was a loan made by one corporation to another corporation, and the commissions charged were allowable, and, if not, the railroad cor-poration could not avail itself of the plea of usury; and, thirdly, that any usury which might have existed in the business or accumu-lated loan of $75,000 or the conveyance of the 25 bonds was purged and eliminated by the mutual action of lender and borrower before or at the time of the final agreement, and it cannot now be urged.

The argument that the complainants were private bankers, and therefore exempt from the penalty of forfeiture of the debt, and only liable to a loss of twice the interest improperly collected, was not touched upon by the appellant, and was only contained in a brief of the appellees in reply to one of appellant. What reply may have been made to it, had an opportunity offered, we do not know; but the position taken therein seems applicable to this case, and conclusive thereof, if there had been no other defense to the charge of usury. The testimony shows that complainants were bankers, and the laws of New York appear to have extended to such individuals the immunity for taking more than the legal rate of interest, which at one time was only enjoyed by incorporated in-stitutions, putting them upon an equality with the national banks in that respect. People v. Doty, 80 N. Y. 225; Perkins v. Smith, 116 N. Y. 441, 23 N. E. 21; Bank v. Dearing, 91 U. S. 29; Bank v. Johnson, 104 U. S. 271. But we do not consider it necessary to rely alone upon this position in order to determine the case. The language of the mutual release of the 18th of March, 1891, is suffi-cient to conclude any complaint or claim which either party had

against the other growing out of any previous transaction. The testimony shows that the charge of usury had been made and fully considered, and that the lender had declared himself ready to strike out any item of usury or usurious demand, and had stricken out all pointed out, or claimed to be such, by the party complaining. It is the recognized rule of law of New York that usurious contracts may be purged of usury by the mutual agreement of the parties, and, where such agreement has been made and accepted, the burden of proof is upon the party subsequently complaining, after mutual agreement and release and a lapse of time, to show fully and conclusively that there was usury intentionally remaining in the alleged indebtedness; and this we do not consider has been done. The first loan negotiated was in behalf of the railroad, its proceeds used to pay an existing lien, and the balance used for the benefit of the property, and the note signed by Thomas as president of the road. We do not find that it was a loan to Thomas, and not to the road, and therefore subject to the defense of usury. The contract and agreement of March 17, 1891, was a contract of conveyance for certain considerations, namely, the relinquishment of certain claims, the payment of $3,000, and a salary of $1,500, and a right to sell the property within a year, and receive one-half of the net profits. This certainly was not a usurious contract, and, if reliance can be placed upon the language and recitals of any written instruments, we can but consider that by the agreement witnessed by the certificate of release of May 18th any previous contract or agreement had been fully purged from any usury by a mutual understanding; and if, by any mistake or omission, such was not done, Thomas, in good conscience and equity, should not be permitted to set it up after permitting the expenditure of more than $20,000 additional upon the strength of such agreement, with no offer to refund any portion of the amount honestly due. The evidence shows that it was the intention and desire to eliminate any and all usury, and, if it was not done, it was an omission both on the part of complainant and the defendant in not pointing out the item now complained of.

We concur with the views and findings of the court below, and the decree appealed from is affirmed.