HARDIN *et al. v.* GRENADA BANK *et al.*

(In Banc. May 9, 1938.)

[180 So. 805. No. 32612.]

W. J. Evans, of Calhoun City, and W. I. Stone, of Coffeeville, for appellants.

**A. M. Carothers**, of Grenada, and **Watkins & Eager**, of Jackson, for appellees.

Argued orally by **W. I. Stone**, for appellants, and by **A. M. Carothers** and **Tom Watkins**, for appellees.

**McGowen, J.**, delivered the opinion of the court.

On December 24, 1934, J. A. Hardin and his wife exhibited their bill of complaint against the Bank of Grenada, J. M. Woodruff, and others, alleging that appellants, the Hardins, in January, 1920, secured a loan of $45,000 with 6 per cent. interest, from the bank, due January 2, 1921, and that the notes were secured by a deed of trust on a number of tracts of land in Calhoun county;

that in January, 1921, there was a renewal of the principal sum of the original debt at 10 per cent. interest per annum, and a payment of $900 bonus for forbearance, or extending the loan. The bill alleged successive and continuous renewals of the notes until 1932, and further that a foreclosure sale of the lands described in the deed of trust was had by the trustee named in the deed of trust in December, 1934, for the sum of $1,200, wherein J. W. Woodruff was the nominal purchaser. The bill further alleged that Woodruff simply held the title, in effect, for the Grenada Bank, and the sale was pretended and fraudulent, and the consideration therefor was grossly inadequate; and that the trustee was notified in writing, as was the purchaser, Woodruff, at and before the sale, that the bank and the trustee had no right to sell the land nor any claim against it, and many other details.

The bill charged that in 1921, at the time of the first renewal, the contract, the notes, and the deed of trust became tainted with usury, in that the renewal notes stipulated 10 per cent. interest, and further that $900 bonus was paid in order to secure an extension of the loan. The bill further alleged that the appellants had paid the appellee bank far in excess of the amount of the principal due on the loan, if interest was forfeited under the usury laws of this state and all payments applied to the principal debt. It alleged that the notes had been fully paid, and the deeds of trust securing them were of no further effect, before the foreclosure sale, and prayed a cancellation of the deeds of trust as a cloud upon the title of the appellants.

The appellee bank answered the bill, denied the charge of usury, and set up defensively that if usury had been charged in the renewal of the note in 1921 the appellants had waived the usury, in that there had been a purging of the original usury by the subsequent renewal in 1922 and later in 1925, and that the appellants were estopped, because of the facts attending the renewals, from setting

up the usury in the contract. The bank denied that there was any fraud in the sale, or inadequacy of consideration under the circumstances, and denied many other allegations of the bill tending to allege fraud in some manner.

Finally, the answer of the Grenada Bank was amended and a cross-bill was made a part thereof, by which the bank sought to recover a money decree over for an amount in excess of $10,000, alleged to be due the bank at that time, this amount being in excess of the amount claimed to be due the bank after crediting the proceeds of the foreclosure sale. The three-year statute of limitation, Code 1930, section 2299, was also pleaded as to all usury and payments.

After the pleadings were thus made up, the chancery court proceeded to hear the case, and, after proceeding at some length, on motion of the appellee the chancellor referred the cause to a master to make and state an account between the parties. Subsequently the master from time to time heard all the evidence but did not state an account, however, he did file with the chancellor his findings of fact and law. The master's report was excepted to by both parties, and the chancellor heard the exceptions and entered a decree approving the findings of the master in all respects, except as to a money decree over in favor of the bank against the Hardins.

The master found, in substance, as follows: (1) That he did not find anything in the evidence to show fraud on the part of the bank; (2) that the loan of $45,000 made to the Hardins by the bank in the year 1920 became a usurious transaction the latter part of said year and lost its interest bearing quality after December 30, 1920, in that the bank took a renewal note from the Hardins with 10 per cent. interest per annum, added to the face of the note, and further that $900 was paid to the bank as a bonus for said renewal, not as a payment for past-due interest on the original 6 per cent. contract in order to make it bear 8 per cent. interest but was, in fact, a pay-

ment of usury for forbearance in advance; (3) that the loan was never thereafter purged of usury; that the Hardins did not waive the usury and were not estopped from claiming the benefits of the law against usury; (4) that by the application of all the payments made by the Hardins subsequent to December 30, 1920, to the principal of said indebtedness, the principal became paid and overpaid in the sum of about $2000 on December 21, 1925, and that any right of action which the Hardins had accrued to them December 21, 1925; (5) that the principal debt having been extinguished on December 21, 1925, the three-year statute of limitations bars the action to set aside the sale of the land by the trustee to Woodruff, and that said sale was valid and binding; and (6) that the defendant, the Grenada Bank, was entitled to a decree over for the amount due it—$10,916.77—and that because of the statute of limitations, no set-off would be allowed to the appellants because of payments.

The exceptions of the appellants challenged the correctness of the master's report in applying the statute of limitations to the payments in allowing a money decree over against them, and in declining to set aside the foreclosure sale.

The appellee bank excepted to that part of the report which held that the parties had not purged the usury, or that the Hardins had not waived or become estopped by the renewals which shall hereafter more fully appear.

Upon hearing the exceptions the chancery court approved the findings of the master in all respects, except that it decreed that the bank was not entitled to a money decree over, for the reason that the payments made by the Hardins, applying the law of usury, had far exceeded the balance found due, and that the Hardins were entitled to off-set those payments against said amount, but it approved the master's report that the prayer of the original bill to cancel the deed be denied. From the de-

cree of the chancellor the appellants filed a direct appeal and the appellees a cross-appeal.

In stating the facts necessary to a decision we find substantially the following:

On December 6, 1920, Hardin executed five notes, due January 2, 1921, for $47,700, which was a loan of $45,000 with 6 per cent. interest added thereto. About the time of the maturity of these notes Hardin asked for an extension of a year and stated that he was unable to pay the principal of $45,000. In response to Hardin's request J. T. Thomas, president of the Grenada Bank, wrote him the following letter:

"Grenada, Miss.
"December 20, 1920.
"Dr. J. A. Hardin,
"Derma, Miss.
"Dear Doctor Hardin:

"Have letter from Bertram under date of the 18th, advising you would not be in position to pay any portion of note $45,000.00 maturing January 3rd. To say that I am surprised but half expresses my feeling.

"Don't you imagine you could secure a loan of say $25,000.00 to $30,000.00 on the property on first mortgage, when we might take second mortgage?

"If we must renew the paper in full, Doctor, will be necessary for you to pay 8% for the past year, and 10% on future loan, and give additional security on the value of not less than $15,000.00.

"It is like this, we will be compelled to sell your note, and in order to do so will have to allow a liberal discount, possibly as much as 4%, maybe 5%, again, money is costing us 8% and we have paid practically 7% during the year, therefore, suggestion at 8% for interest rather than 6% seems fair and I feel will appeal to you.

"Bertram advised you would be glad to give the additional security asked. Would like the loan in two notes, one for $25,000.00 and the other for $20,000.00,

taking second mortgage in order to sell first, if we can do so at all. Advise please.

"Please accept my best wishes,

"Yours truly,

"J. T. Thomas, President."

Bertram referred to in this letter is Bertram Bayes, cashier of another bank, who was related to Hardin and was instrumental in negotiating the $45,000 loan.

In response to this letter the loan was renewed in accordance therewith, with other lands included in the deed of trust, and instead of paying 6 per cent. interest for the year 1920, or $2700, Hardin sent his check on the Bank of Derma, payable to the Grenada Bank, for $3600, which check was indorsed by the Grenada Bank, and $2700 thereof credited by it to Hardin as interest paid on January 4, 1921. No entry appears on the note record of the Grenada Bank of this $900, although the master found, and could not otherwise find, that this $900 was paid on that date by this check. Dr. Hardin executed two notes, one for $22,000, and the other for $27,500, a total of $49,500, included therein was 10 per cent. interest per annum on the principal of $45,000. When these notes were about to mature Hardin complained to the bank by letter and by conversation that he had been required to pay 12 per cent. interest and wanted the rate, as originally made, of 6 per cent. interest. To this complaint the president of the bank replied:

"Grenada, Miss. January 30, 1922.

"Dr. J. A. Hardin,

"Derma, Miss.

"Dear Dr. Hardin:

"Replying to yours of the 26th. Did not know until recently that you had been charged 10% interest on the notes. Difference between 8% and 10% has this day been credited on the back, and amount charged to Profit and Loss, so no complaint there. You say you agreed to pay 6% on the original loan and thereafter you were

charged 2% additional. Perhaps has not occurred if you had paid the obligation at maturity as promised, this excuse would not have been made by you. 'How do you except me and others to pay such rates of interest?' We had expected you to do so, Doctor, but so far you have failed us, and in order to convince you that we have no inclination to work a hardship, if you will give us back in thirty days our money we will waive interest charges. In other words, be pleased to favor you in this way for the favor you might do us in paying the amount of the large loan from which, of course, as you understand, we have derived no profit, in as much as the business does not carry a corresponding account.

"Think you will consider this a very fair proposition and sincerely trust you will be in position to accept the same.

"Am writing Bertram to-day, as per copy of letter enclosed.

"Accept please, regard and assurance of best wishes,
"Yours truly,
"J. T. Thomas, President."

The $900 paid as bonus for the extension of the loan on January 4, 1921, was not again mentioned by either party during that time.

The loan was again renewed by Hardin, executing six notes aggregating $48,501, with 8 per cent. interest included to date of maturity, and due about January 1, 1923. About May 1, 1923, the amount of $17,114, including interest at 8 per cent., was renewed, and in 1924 the indebtedness was renewed for a balance, interest at 8 per cent., of $14,564, due on and before January 1, 1925. In 1925 Hardin requested the bank to grant him a renewal of the balance, but also asked that from the inception of the loan to that time the bank rebate to him the interest in excess of 6 per cent. Thomas, representing the bank, declined to do this, and wrote Hardin that if he would pay the balance down to $11,000 he would ac-

cept the note due December 1, 1925, for $3000, and four notes for $2000 each, due, respectively, in 1926, 1927, 1928, and 1929, bearing 6 per cent. interest, and called Hardin's attention to the fact that he had made the rebate of 2 per cent. on the 10 per cent. loan in 1921. The notes were executed in accordance with Thomas' stipulation, and thereafter the balance was renewed in 1929, 1930, 1931, and 1932, and included therein were two additional loans of $3000 and $4000 at different times, and up to 1931 there were substantial payments made to the bank by Hardin.

Hardin admitted in his testimony on cross-examination that as to the 1925 arrangement, when the debt was reduced to $11,000, he had assented thereto; that it was not forgotten but had been agreed to by him. He contended that he did not know of the usury law. He testified that a copy of the notice was served on Woodruff and the trustee on the day of the foreclosure sale and publicly announced by him. He further stated, in effect, that he made the renewals as and when the president of the bank suggested because he had to.

It is clear from the testimony of Adams, the cashier of the bank, that the note providing for 10 per cent. interest added to the principal passed through his hands and was entered on the notebook by some subordinate of the bank, although he said he did not know that it provided for 10 per cent. interest until late in 1921 or early in 1922 when Hardin made complaint.

In several of the letters Thomas expressed himself, after they had adjusted the question of interest, as being happy that they had ''arranged the matter,'' or ''settled the matter.'' Thomas used this language in one letter after the debt had been reduced to $11,000: ''Am very glad, indeed, Doctor, to have gotten our matter arranged satisfactory to you, for I certainly esteem and regard you as my friend as well as a live, progressive citizen, and one who should be encouraged.''

In all the deeds of trust there is to be found substantially the following language: ''This deed of trust is given and taken to secure renewal of amount due under trust deed bearing date first day of March, 1925, and is in no way intended to void the said trust deed or impair the security thereof.'' The dates, of course, were changed so as to refer to the last preceding deed of trust in effect.

1. We are of the opinion that the proof amply sustains the finding of the master, approved by the chancellor, that if the law of usury as construed in this state be applied, leaving out of view the statute of limitations, the entire principal sum of the debt, including new loans, was paid at the date of the sale, and we think it would not be profitable to demonstrate that there was ample evidence to support this finding.

2. We are of the opinion that from the inception to the foreclosure in pais there was a continuous transaction of renewals and payments between these parties, which were mutual, including the fact of the first new loan in 1929 and the one subsequent thereto.

3. There can be no question but that on the renewal date in January, 1921, this contract became tainted with usury in two ways, first, the bank required a note with 10 per cent. interest per annum added to the face thereof, and second, the bank required, and Hardin paid, $900 to the bank, the consideration for which was the extension of the loan and the further forbearance of the bank. The master so found, and there was no exception thereto. The chancellor approved this finding of the master. This $900 was clearly paid as a bonus, because it was only required to be paid to make up 8 per cent. interest for the past year in case the note was renewed, that is clear from the letter of Thomas to Hardin, wherein Thomas fixed the terms of the first renewal. This agreement made between the parties, whether they knew the law or not, was a contract for usury, and the stipulation that it was a payment of additional interest on past-due

paper was a mere device, the effect of which was an attempt to avoid the usury statute. It is manifest that this $900 bonus, according to the note record of the bank, was not credited to the past-due note but it disappeared entirely so far as this record from the books of the bank shows. It is also significant that on the note record of the bank the rate of interest was not entered as being 10 per cent, and no rate of interest shown, although all the other entries of renewal with reference to this note on the record book showed the rate of interest charged. The bonus was paid after the 1920 note had matured.

The law (usury statute) will not tolerate any devices to defeat its provisions when the consummation of usury is really intended. Commercial Bank of Manchester v. Nolan, 7 How. 508. The president of the bank may have written the letter, which we have set forth in full, with the secret motive he entertained that it would require the debtor to pay, but when the bank received the note with 10 per cent interest added thereto and the $900 bonus, usury was stipulated as to the note and actually accomplished as to the receipt and retention of the $900 bonus. The agreement to pay this additional $900 bonus was finally consummated and credited by the bank after the first maturity date of this loan. Such an agreement to pay more than the legal rate in consideration of forbearance is usurious. McAlister v. Jerman, 32 Miss. 142. The maximum legal rate of interest in this state during all the time of these transactions was 8 per cent. See section 1946, Code 1930.

4. The chancellor correctly applied the statute of limitations in so far as he permitted all payments made by Hardin to be credited on the principal debt claimed by the bank. The recitations in the deeds of trust show unmistakably that this was a continuous transaction from 1920 to the date of the foreclosure. It was not only tainted with actual usury collected—$900 bonus being carried throughout the entire transaction from January 4, 1921

—but it was a violation of the usury statute in that the renewal notes stipulated for a greater rate of interest than 8 per cent per annum. The stipulation is condemned by the statute, although not actually collected. Chandler v. Cooke, 163 Miss. 147, 137 So. 496. Section 1946, Code 1930, provides that "if a greater rate of interest than eight per centum shall be stipulated for *or* received in any case, all interest shall be forfeited, and may be recovered back, whether the contract be *executed* or executory." (Italics ours.) When a contract becomes tainted with usury, as in the case at bar, then all the payments made by the debtor to the lender are credited by the law to the principal and all interest is forfeited. In the case of Jones v. Brewer, 146 Miss. 142, 110 So. 115, 116, this court held as follows: "On the point presented by Brewer on cross-appeal, that is, that the court should not have allowed the amount of the usury as an off-set against the amount due by Jones because it was barred by the statute of limitation at the time it was offered, we are of opinion the Chancellor was correct in allowing the usury as an off-set against the claim of Brewer, because while it would ordinarily have been barred by the lapse of time, yet it could be pleaded as an off-set, because it was a debt due to Jones by Brewer at a time when the claim of Brewer against Jones was in existence." Also, see section 2317, Code 1930, and Union National Bank v. Fraser, 63 Miss. 231; Beck v. Tucker, 147 Miss. 401, 113 So. 209; Feld v. Coleman, 72 Miss. 545, 17 So. 378.

5. As to the contention of cross-appellant that conceding usury the parties purged the contract of usury, or Hardin waived his right to assert it in this case, or there was an accord and satisfaction, or an equitable estoppel, we are of the opinion, without restating the evidence set forth, that the letter of Thomas to Hardin, dated January 30, 1922, must be, and is, the only basis for any of these contentions. Hardin had not complained of *usury*, he had requested a renewal with a lower rate of

interest; he was not contending that all interest was forfeited, and there was no contention between the parties as to usury, it was the plea of a debtor to a creditor to allow him a rate of interest, less than the maximum legal rate. In that letter Thomas said: "You say you agreed to pay 6% on original loan and thereafter you were charged 2% additional. Perhaps has not occurred if you had paid the obligation at maturity as promised, this excuse would not have been made by you. 'How do you expect me and others to pay such rates of interest?' (Quoting from Hardin.) We had expected you to do so, Doctor, but so far you have failed us, and in order to convince you that we have no inclination to work a hardship, if you will give us back in thirty days our money we will waive interest charges." Let it be remembered that Hardin had already stated that he could not pay the principal of the debt. There is nothing in this letter, granting that it was acceded to by Hardin in that the note was renewed by him, that created a waiver or an estoppel. The case amounts to this: The borrower said to the lender, "You are charging me a high rate of interest—twelve per cent—I cannot live and pay such high rate of interest. I ask you to reduce the rate to six per cent, as it was in its inception." Thereupon the bank, in effect, said to him, "We will not charge you twelve per cent but we will retain the $900.00 bonus, and credit you on the notes, evidencing the usury, with two per cent so that you pay only eight per cent interest on the note." Nothing more was said, except the execution of the renewal papers, and in those papers the $900 bonus was integrated in the debt and charged to Hardin and retained by the bank. The vice remains. The illegality was carried forward. There was no contention between them as to usury; they both knew that it was usury and are held to have so known by the law. See Chandler v. Cooke, supra. In other words, the bank reduced its usury without any contention that either the 10 per cent

interest on the note or the $900 bonus was legal, and without any contention on the part of Hardin that either was illegal. Hardin's only complaint was that it was "high"; he did not ask the bank to rebate the 2 per cent. on the 10 per cent. notes for the past; he requested a lower rate of interest in the future.

The president of the bank, as disclosed by his testimony, was an astute business man and saw at a glance that the evidence on his books convicted him of usury. The $900 bonus was apparently forgotten by him, as there was no evidence of its payment on the books. There was no settlement, no compromise, and all that Hardin did was to execute renewal papers from time to time as required by the lender. There was no attempt to compromise and no attempt to accomplish an accord and satisfaction. A mere renewal of a note tainted with usury is not an accord and satisfaction, nor can such be an estoppel. In the case of Torrey v. Grant, 10 Smedes & M. 89, this court held that, if a note is affected with usury in its origin, every renewal or change of the security is equally affected; nor will the usury be cured when a greater sum than the usurious interest is paid on the debt; and that the indorsee of an usurious note, who at the time he obtained the note had knowledge of the usury, cannot recover thereon beyond the principal sum, even though he took the note upon the assurance of the maker that he would make no defense to it; the consideration being an illegal one, the waiver of the defense was not binding on the maker as to a party having notice, and it would be otherwise with a mere failure of consideration. In that case the borrower had written Grant, the purchaser of the note, that he held no offsets against it. Afterwards he set up the usury therein, and was permitted so to do. The court there said: "Grant took the note, knowing that it was in part founded on an illegal consideration. He was not deceived in the purchase."

In the case at bar the lender took the borrower's note

with full knowledge of all the facts and at a time when there was neither a dispute of fact or law pending between the parties. The authorities out of this state are numerous, and authorities can be found elsewhere sustaining the doctrine of estoppel, but not in this state under this announcement of the law, which remains unchallenged. See Bass v. Patterson, 68 Miss. 310, 8 So. 849, 24 Am. St. Rep. 279. To illustrate this court's position, we refer only to one case from another jurisdiction, Thompson v. Prettyman, 231 Pa. 1, 79 A. 874, in which the court held that, where the taint of usury attaches to an original transaction between a borrower and lender, it attaches to all consecutive obligations or securities growing out of the original vicious transaction, and none of the descendant obligations, however remote, can be free from it if the descent can be traced; and that "where there has been a voluntary payment of usury, a subsequent release without consideration of any claim based upon such usury will not avail as a defense to the recovery of the usury paid by the borrower. The rule obtains when a release is exacted as a condition to the settlement of the loan for the usury paid on the loan, or on prior successive loans forming parts of one and the same transaction." In that case the lender had accepted a deed to real estate from the borrower and had included therein a statement that the usury was discharged by the consummation of that deed. That was a very much stronger case for estoppel than is presented here. We find no element of estoppel or waiver in the renewal for the year 1925. It is very probable from all the evidence that the debtor in this case did not intend to avail himself of the usury statute and did not undertake to do so until his "back was to the wall," and he saw that his property was about to be lost by the foreclosure sale. It is not unusual that a debtor in hard circumstances will continue to renew loans, pay usury, and make no claim therefor until bankruptcy stares him in the face. We think that there was no effort in this en-

tire record to purge the debt of usury by any transaction had between the parties either in 1922 or in 1925, and it does not appear that there was a claim or counterclaim interposed by either of the parties until this suit arose.

So far we have been in accord with the court below and have approved its findings of fact and of law. The last question presented in this case by the appellants is that the foreclosure sale should be set aside because $1,200, the price paid by Woodruff, was wholly inadequate, and that the proof shows that the land, on the day of the sale, was worth from five to eight times the amount paid by the purchaser for the deed executed to him in pursuance of that sale. Mere inadequacy of price is not ground for setting aside a sale. It is only when the price paid shocks the conscience of the court that the sale will be set aside on that ground. In this case, however, the evidence shows that the foreclosure sale was had when the entire country and the state were in the throes of a depression, and the evidence tends to show that at foreclosure sales estimated values were not realized, so that we think we are not warranted in saying that the chancellor was manifestly wrong in his finding to that effect.

It is further contended by the appellants, however, that at the time of, and long before, the date of the sale, the debt, by the application of the law of usury, had been fully paid, and therefore the deed of trust given to secure it had been extinguished. The facts are undisputed in this case that on the day of the sale and prior thereto, Dr. Hardin appeared and served written notice on all persons present, including the · trustee and the purchaser, Woodruff, that he owned the land, and that the trustee was wrongfully foreclosing and had no right so to do. Woodruff being so advised, is in no better position than the mortgagee, had the latter been the purchaser at the sale, this being a foreclosure in pais and not by a decree of the chancery court. Our usury stat-

ute does not declare a contract so tainted to be void, but only voidable at the instance of the debtor, who may assert it in court as a defense and have all the interest applied to the payment of the principal. In other words, usury is a defense which must be pleaded and which may be waived and a judgment or decree based upon a usurious contract is valid. Chandlee v. Tharp, 161 Miss. 623, 137 So. 540, 78 A. L. R. 445. In that case, however, the court permitted the debtor to recover the sale price of the lands involved after there had been a foreclosure, and said, in effect, that the debtor had the right either to affirm the sale and recover the purchase price or to have the sale set aside, where no debt was due. In the case at bar Dr. Hardin asserted his right before the sale, which if the trustee and the mortgagee had investigated would have demonstrated Hardin's claim that the debt, which the mortgage secured, had been paid.

Section 2152, Code 1930, provides that payment of the money secured by any mortgage or deed of trust shall extinguish it, and revest the title in the mortgagor as effectually as if reconveyed. There are authorities in other jurisdictions which hold that, where the contract is usurious and the deed of trust has been foreclosed with the mortgagee as the purchaser, the debtor is then without remedy and may not have the foreclosure set aside, basing their conclusions upon the fact that the statutes did not declare a usurious contract void but only voidable, and that usury is a defense which must be interposed. It would prolong this opinion to take up each of the cases but we will consider Jones v. Meriwether, 203 Ala. 155, 82 So. 185, which perhaps devotes more attention to the precise question than any other case which we have had occasion to examine. There, upon facts not essentially different from the ones here, except for Hardin's notice before the sale, the court laid particular stress upon the fact that the contract had been executed. Our statute applies to contracts whether executory or executed; the statute of Alabama under con-

sideration in that case did not contain that language. Moreover that court laid stress upon the fact that the mortgage had been executed by foreclosure.

The same distinction is to be found in the case of Grove & Fultz v. Great Northern Loan Co., 17 N. D. 352, 116 N. W. 345, 138 Am. St. Rep. 707, where the court reached the same conclusion as the Alabama court, but it did not appear that the North Dakota usury statute was made to apply to executed contracts, nor did it appear that a section similar to our section 2152, Code 1930, providing that when the debt is paid the mortgage is extinguished and the title of the mortgagor is as if it had been reconveyed to him, was in force, nor was there direct notice to the purchaser at the sale. The court held that the mortgagor was remediless to have the sale set aside after the foreclosure because of the usury. In none of the cases does it appear that the mortgagor appeared at the sale and warned all the parties that the mortgage was ineffective and the title to the land was in him, as was done in the case at bar, which we think was affirmative action on the part of the debtor sufficient to set up his claim of usury before the foreclosure sale had been consummated. The only other thing he could have done would have been to have procured an injunction, and on that day, December 3, 1934, a majority of the debtors in this state would have been helpless if injunction had been the only remedy. We are therefore of the opinion that there being no debt under the facts of this case there was no mortgage to foreclose, and that the sale should be set aside, and the title to the land described in the deed of trust should be vested in the appellants, Hardin and wife. Likewise the policy of insurance ordered by the court delivered to the clerk, inferentially for the purpose of being delivered in accordance with the opinion of this court, should be delivered by the clerk to the appellants.

In so far as the court declined to set aside the sale and fully vest the title in the Hardins, so far as Wood-

ruff and the bank are concerned, the decree of the court below is reversed, and in all other respects it is affirmed.

Affirmed on cross-appeal, and on direct appeal reversed in part and decree here for appellants.

**Smith, C. J.**, delivered a dissenting opinion.

The decree of the court below on both the direct and cross-appeal should be reversed and the bill of complaint dismissed.

It will be necessary for me to discuss only the appellants' claims (1) that the notes executed in 1921 were tainted with usury, and (2) that the price paid for the land at the trustee's sale thereof is so inadequate as to require the setting aside of the sale.

1. *As to the Usury.* In order to obviate referring therefor to the opinion in chief, I will briefly state the facts here pertinent.

The appellants are husband and wife, and in all of their dealings with the appellee bank, the husband, J. A. Hardin, acted both for himself and his wife, she not participating therein except to sign the necessary papers. On January 9, 1920, the appellants borrowed from the appellee, Grenada Bank, $45,000, agreeing to pay 6 per cent. interest thereon from date. Several notes were executed therefor aggregating $47,700, due January 2, 1921, secured by a deed of trust on land. The $2,700, additional to the principal of the loan, was for the 6 per cent. interest thereon for one year. Sometime prior to the maturity of these notes, J. A. Hardin advised the bank that he would be unable to pay any of the notes when due. Parol evidence and the following letter from the president of the bank to J. A. Hardin discloses that the bank did not wish to carry the loan longer, but desired that it be paid. The letter is as follows:

"Grenada, Miss.
"December 20, 1920.
"Dr. J. A. Hardin,
"Derma, Miss.
"Dear Doctor Hardin:

"Have letter from Bertram under date of the 18th, advising you would not be in position to pay any portion of note $45,000.00 maturing January 3rd. To say that I am surprised but half expressed my feelings.

"Don't you imagine you could secure a loan of say $25,000.00 to $30,000.00 on the property on first mortgage, when we might take second mortgage?

"If we must renew the paper in full, Doctor, will be necessary for you to pay 8% for the past year, and 10% on future loan and give additional security on the value of not less than $15,000.00.

"It is like this, we will be compelled to sell your note, and in order to do so will have to allow a liberal discount, possibly as much at 4%, maybe 5%, again, money is costing us 8% and we have paid practically 7% during the year, therefore, suggestion at 8% for interest rather than 6% seems fair and I feel will appeal to you.

"Bertram advised you would be glad to give the additional security asked. Would like the loan in two notes, one for $25,000.00 and the other for $20,000.00, taking second mortgage in order to sell first, if we can do so at all. Advise please.

"Please accept my best wishes,
                "Yours truly,
                        "J. T. Thomas, President."

Thomas testified that he did not intend to charge 10 per cent. interest on the loan if renewed, but that his statement in his letter that 10 per cent. would be charged was intended to induce Hardin to pay the notes, as the bank did not wish to carry the loan longer; and there is nothing in the evidence warranting the rejection of his testimony. It is hardly probable that he intended to

write into the notes an illegal rate of interest which would render all interest uncollectible.

Hardin paid the $2,700, the 6 per cent. interest on the original notes, by a check for $3,600, $900 of which was to meet the request of the bank that he pay an additional 2 per cent. interest on the loan, thereby making the interest thereon 8 per cent. allowed by the statute. Thereafter, new notes aggregating $45,000 were mailed to the bank, by whom it does not clearly appear. These notes bore 10 per cent. interest from date and were due January 1, 1923. It is clear from the evidence that no officer or employee of the bank noticed, or became aware, when the notes were accepted by the bank, that they bore 10 per cent. interest. In January, 1922, Hardin complained to the bank that he had been charged 12 per cent. interest on the notes executed in 1921. This he arrived at by adding the 2 per cent. which he had paid on the maturity of the 1920 notes to the 10 per cent. charged in the 1921 notes. Though the fact is not here material, he made no request then for the reduction of the interest to 6 per cent., but did make such a request some years later as will hereinafter appear. This claim of usury was satisfactorily adjusted between Hardin and the bank by the latter crediting him with 2 per cent. on the notes executed in 1921. The result was that the interest actually received by the bank on the loan for the years 1920 and 1921 was the 8 per cent. thereon permitted by section 1946, Code 1930.

While the adjustment of this usury charge was pending, the bank expressed a desire for the payment of the notes instead of a renewal thereof, and a letter dated January 30, 1922, from the president of the bank to Hardin, contains this sentence: ''and in order to convince you that we have no inclination to work a hardship, if you will give us back in thirty days our money we will waive interest charges. In other words, be pleased to favor you in this way for the favor you might do us in paying the amount of the large loan from which, of

course, as you understand, we have derived no profit, inasmuch as the business does not carry a corresponding account.'' Hardin declined to accept this proposition, but, after the adjustment of the usurious claim, made a payment on the notes, and the bank permitted him and his wife to execute renewal notes for the balance, bearing 8 per cent. interest, payable one year after date. When these notes became due, they were again renewed and the same process continued until the last renewal, in December, 1932. Some of the renewal notes included new loans, and, beginning in 1926, bore only 6 per cent. interest. This reduction in interest came about in this way. Hardin advised the bank that he was having difficulty in paying the notes, and that, if it would restate his account with it from the beginning charging him only 6 per cent. interest per annum thereon and accept renewal notes bearing 6 per cent. interest for the amount so appearing to be due by him, he would be able to meet the payment thereof. The bank declined to do this, but advised him that if he would pay a certain amount on the notes it would accept renewal notes for the balance, bearing 6 per cent. interest. This proposition Hardin accepted. The interest on all of these notes was paid annually, and all were secured by deeds of trust on land.

Section 1946, Code 1930, is as follows: ''The legal rate of interest on all notes, accounts and contracts shall be six per cent per annum; but contracts may be made, in writing, for a payment of a rate of interest as great as eight per centum per annum. And if a greater rate of interest than eight per centum shall be stipulaterd for or received in any case, all interest shall be forfeited, and may be recovered back, whether the contract be executed or executory. If a rate of interest in contracted for or received, directly or indirectly, greater than twenty per centum per annum, the principal and all interest shall be forefeited, and any amount paid on such contract may be recovered by suit.''

''To constitute usury, there must be an agreement be-

tween the lender and the borrower of money, by which the borrower knowingly gives or promises, and the lender knowingly takes or reserves, a higher rate of interest than the law allows, and with an intention to violate the statute.'' Planters' Bank v. Snodgrass, 4 How. 573. The appellants' claim of usury in the notes executed by them in 1921 is based on two facts: (1) The payment by them of 2 per cent. additional interest on the notes executed in 1920, as a condition for the renewal thereof, and (2) the 10 per cent. interest charged on the face of the 1921 notes. The reason assigned by the appellee for the exaction of the 2 per cent. increase in the interest agreed to be paid by the appellants on the 1920 notes was that the bank itself was borrowing money during that year, for which it paid interest sometimes as high as 6 per cent. I will assume, however, though the question is not without difficulty, that this 2 per cent. must be held to constitute a part of the interest charged the appellants on the 1921 notes. On the evidence, as will hereinbefore appear, the court below could have found that the appellee did not intend to charge 10 per cent. interest on the notes executed in 1921 and was not aware that the notes so stipulated until its attention was called thereto by Hardin when the notes matured. The finding of the court, however, to the contrary, is conclusive here.

The question then is: Did the appellants lose the right to complain of this usury by what occurred between them and the bank when the notes in renewal of the 1921 notes were executed? Where a loan of money is usurious, the usury is brought forward into all successive mere renewals of the loan. But we are not faced here with mere renewals, but with renewals permitted to be made after the borrower's claim of usury in the original loan has been compromised and settled to his satisfaction. ''Though a contract is tainted with usury, the abandonment of the usurious agreement and the execution of a new obligation for the amount of the actual

debt, free from the usury, and bearing only legal interest, purges the original usury and makes the second obligation valid and enforceable.'' Note to Ector v. Osborne, 13 A. L. R. at page 1220. This statement is followed by a legion of court decisions among which is De-Wolf v. Johnson, 10 Wheat. 367, 6 L. Ed. 343, and there seems to be no dissent in the authorities therefrom. It is true that here the notes executed in 1921 were not surrendered and new notes executed in lieu thereof, but what here occurred was the equivalent thereof. Section 1946, Code 1930, is for the protection of borrowers, which protection they may waive, Wetter Mfg. Co. v. Dinkins, 70 Miss. 835, 12 So. 584, 13 So. 226, and their claims of usury may be compromised and settled, and a renewal of the loan then made bearing a legal rate of interest is free from the usury of the original loan. Ector v. Osborne, 179 N. C. 667, 103 S. E. 388, 13 A. L. R. 1207; Beck v. Bank of Thomasville, 161 N. C. 201, 76 S. E. 722; Thomas v. Coffin, 5 Cir., 62 F. 665, 10 C. C. A. 582; Credit Finance Corporation v. Mox, 125 Cal. App. 583, 13 P. (2d) 937; Morris v. Taylor, 22 N. J. Eq. 438. See, also, Pattison v. Albany Bldg. & Loan Association, 63 Ga. 373; Dannenmann v. Charlton, 113 La. 276, 36 So. 965; Ryan v. Newcomb, 125 Ill. 91, 16 N. E. 878. Cf. Jefferson Standard Life Ins. Co. v. Davis, 173 Miss. 854, 163 So. 506. Moreover, if the facts necessary to constitute an estoppel exist, the borrower will be estopped from pleading usury. Henderson v. Hartman, 65 Miss. 466, 4 So. 549; 66 C. J. 278. Do such facts exist here?

To briefly repeat what has heretofore been stated, when the time arrived for the payment or renewal of the appellees' notes, executed in January, 1920, the appellant, who also represented his wife, complained to the bank that they had been charged 12 per cent. interest on the notes. This complaint was adjusted to their satisfaction by crediting the notes with 8 per cent. interest, and the appellants were then permitted to renew the notes with legal interest on the notes. It is clear from

the evidence that the bank did not desire to carry the loan longer and permitted the renewal notes for the accommodation of the appellants. Had the Hardins not acquiesced in this settlement of their claim of usury, but informed the bank that they would not abide thereby, the bank, of course, would not have permitted them to renew the notes, but would have fully collected them by foreclosure of the deed of trust securing them, if necessary, in which event it would have lost only the interest from 1921. Baldly stated, the appellants, by agreeing to the settlement of their claim of usury, induced the bank to permit them to renew the notes in which this usury appears and many subsequent notes running over a long period of years for a portion of the original loan, without at any time intimating to the bank that they did not intend to abide by the settlement. They now seek to disavow this settlement, and thereby be relieved from paying the bank anything for the use of its money over a long period of time. In equity and good conscience this should not be permitted. Section 1946 of the Code of 1930 furnishes the borrower with a shield and not a sword; is intended to protect him from injustice, but not enable him to inflict injustice.

"Equitable estoppel is the effect of the voluntary conduct of a party whereby he is absolutely precluded, both at law and in equity, from asserting rights which might perhaps have otherwise existed, either of property, of contract, or of remedy, as against another person, who has in good faith relied upon such conduct, and has been led thereby to change his position for the worse, and who on his part acquires some corresponding right, either of property, of contract, or of remedy." Pomeroy on Eq. Jur., vol. 2, (3 Ed.), section 804. This definition of equitable estoppel has always been accepted and never heretofore departed from by this court. It should be adhered to here.

This case may be approached from another angle. Had the appellants paid the notes executed in January,

1920, and the interest charged thereon, and then called on the bank to repay this interest, and had accepted from the bank less than the amount thereof in full settlement, the bank would have thereby been relieved from further liability to them. Clayton v. Clark, 74 Miss. 499, 21 So. 565, 22 So. 189, 37 L. R. A. 771, 60 Am. St. Rep. 521. That case while different on its facts from the case here is at one with it in principle.

2. *The Alleged Inadequacy of the Price for which the Land was Sold at the Trustee's Sale Thereof.* A large part of the land had been sold for taxes, but I will not pause to determine whether all or any of these tax titles had matured. The appellant J. A. Hardin appeared at the sale, read to the persons there assembled, and distributed a written notice setting forth that the land proposed to be sold was not subject to sale under the deed of trust and that "the said pretended sale, if accomplished, is utterly void and can form no basis of claim of ownership of the said lands, and any and all parties pretending to buy any part of said lands or all of the same do so with full and complete notice hereby given that the said sale in all of its features is utterly void and of no effect in conveying title to the land." It thus appears that Hardin himself contributed largely to the sale of the land for an inadequate price, if the price therefor was in fact inadequate, and he cannot now complain thereat.