DICKEY *v.* BANK OF CLARKSDALE.

(In Banc.   Nov. 7, 1938.)

[184 So. 314.   No. 33207.]

G. Edw. Williams, of Clarksdale, for appellant.

**Brewer & Montgomery** and **Chas. A. Sisson,** all of Clarksdale, for appellee.

**W. F. Gee,** of Clarksdale, for appellee.

Argued orally by **G. Edw. Williams**, for appellant, and by **Fred Montgomery**, for appellee.

**Griffith, J.**, delivered the opinion of the court.

Appellee sued appellant on two notes, one for $65 and the other for $1,000, dated, respectively, June 15, 1935 and December 5, 1935, both of which were upon tneir faces due at the time of suit. Appellee recovered judgment for substantially the full amount sued for, with interest.

These notes represented the alleged balances of a continuous and unbroken series or succession of renewals which, for the purposes of this case, may be taken as beginning with a note for $1,500, dated December 1, 1926 and due December 1, 1927, with interest at 8% per annum from date until paid. The interest on this note was paid, as hereinafter mentioned, in cash on the due date, and the note was on said date renewed for the principal sum of $1,500 for another year.

On the due date of the note first aforesaid, that is to say, on December 1, 1927, the bank collected as interest $121.67, calculating the year as 360 days plus 5 days, instead of $120, which would have been the amount of interest due for a calendar year, strictly speaking, at 8%. The first question is thus presented—whether the collection of $1.67 more than $120 renders the transaction usurious.

In Cox v. Timlake, 169 Miss. 568, 573, 153 So. 794, this court held that, in view of the early case, Planters' Bank v. Snodgrass, 4 How. 573, a proper way to compute interest for fractional parts of a year is to treat the year

as being composed of 360 days. If then the note had been made for 180 days, 4% interest could have been lawfully collected on the completion of the 180 days, and a renewal taken for another 180 days, at the end of which time another 4% interest could have been lawfully collected, making 8% or $120 at the end of 360 days; and then the note could have been renewed for 5 days and $1.67 in interest could have been collected, making the total interest $121.67 for the 365 days, which was the amount of interest for the 365 days collected by the bank in the case now before us.

Or the bank could have taken the note for 350 days and calculated the interest upon the basis of 360 days to the year, and then renewed it for 15 days, calculating the interest on the same basis, so that the total interest for the 365 days would have been $121.67. Or the note could have been taken for 364 days, and then renewed for one day and the same result reached. And in this last connection it is at once apparent that unless the view we adopt herein be correct, a note for 364 days will yield more interest than a note for a full calendar year or 365 days. And the further result would be that the only due date for which the straight 8% for a calendar year would be requisite would be a note of an even year, or of 365 days as the due date, and that for all the remainder of the 364 days of the year the interest may be lawfully calculated upon the basis of 360 days to the year. It would mean that by any succession of two or more notes aggregating 365 days the interest could be calculated upon the basis of 360 days to the year, while if only one note be taken and that note for one year, the 360-day basis cannot be used,—so that the mere form of the transaction would work a difference in legal rights; form would be allowed to control and substance would be put aside.

It is evident, therefore, that the cited cases would have to be overruled if the result contended for by appellant is to be reached, else the anomalous legal situa-

tions above presented and illustrated would be brought into the law, which we think would be most awkward, to say the least of it. The majority of the Court, in view of the long reliance of the commercial world upon the rule, upon the statutory interpretation laid down in the cited cases, has declined to overrule them; hence by way of reconciliation we must hold that the transaction above mentioned was not usurious,—that the rule which holds as good for 364 days in the year must be good also for the 365th day; that a year, so far as the law dealing with usury is concerned, is to be considered as 360 days. This is the construction or interpretation which has prevailed for approximately a hundred years, with the usury statutes always using the same language, that is to say, ''per annum,'' and with no change in that specific statute, no change throughout all subsequent revisions of the usury statute even down to this day, which would expressly abrogate the judicial interpretation above mentioned.

On April 5, 1932 the original obligation or debt had been paid down to a balance of $1,300. On that date the entire amount last aforesaid was renewed by one note for $1,150, due November 1, 1932, with 8% interest from date, and by six notes for $25 each, due, respectively, in a series of one to six months after date, and instead of interest eo nomine on the smaller notes, a service charge of $1 for each of said small notes was made and was collected at their stated maturities.

Three questions rise in connection with said smaller notes, and the first is: Did the said service charge render the transaction usurious?

Eight per cent interest on a note for $25 for one month is approximately 16 cents. If the dollar service charge be counted as interest, then the interest would, as to the two first small notes, exceed 20% interest, and as to all the others would, of course, exceed 8%. Whatever may be its euphony, a service charge is something which the bank requires the borrower to pay in order to have the

loan or accommodation, and, therefore, it is interest under another name; and when more than 8% per annum is thereby taken or stipulated, it is usurious.

It is said that on small loans, banks everywhere are making these service charges,—that it has become the universal custom, justified by the fact that the expense of making these small loans cannot be covered by the legal rate of interest; and that unless these service charges are allowed, small loans cannot be made and will have to be discontinued. Whether the small borrower should be required to pay more interest than those who are to receive larger accommodations, is a question to be addressed to the legislative department, since our province is only to declare what the law is, in which connection we must further declare that no custom or asserted business necessity can override the statutes as interpreted by the courts or in any manner displace them.

The second question is: Since the service charge rendered the six smaller notes usurious, does the usury affect only the said twenty-five dollar notes, or does it infect with usury the entire renewal transaction of $1300 in the aggregate. As already stated, the debt which was renewed was $1300. The several notes taken in renewal evidenced that one debt, not several distinct debts. If, instead of taking the large note and the six smaller notes, as was done, one note for the $1300 had been taken, with 8% interest from date until paid, but with stipulations therein for installment payments, $25 to be paid in one month, $25 in two months, and so on for six months, and with the provision or an agreement that one dollar service charge would be made on each of the smaller installment payments, we would have the exact equivalent in substance of what was actually done, and it would have rendered the entire renewal transaction usurious.

Early in our judicial history it was said that it is well settled that where the transaction is one entire contract, and it is usurious as to part, it is illegal as to the whole, so far as the interest is concerned. Brown v. Nevitt, 27

Miss. 801, 822; and in a late case, Kennedy v. Porter, 176 Miss. 742, 748, 170 So. 286, it was held that in usury cases courts will look through the form to the substance, and that the real facts in the latter respect will control. Inasmuch as each of these renewal notes made on April 5, 1932 was a part of the same transaction, rested on the identical previous consideration (compare Jones v. Brewer, 146 Miss. 142, 110 So. 115), the answer to the second question is, therefore, that the interest on the $1150 note, as well as each of the smaller notes, was forfeit. It is immaterial that the holder of one of the smaller notes may have been able to maintain an action on it after its due date; this could be done as well for a past-due installment on an installment note, such as has above been mentioned by way of illustration.

The third question is this: The service charge on the smaller notes made the interest on the first two of them usurious to the extent of more than twenty per cent, so that, if separately considered, the principal as well as the interest in those two notes would become forfeit. Does the forfeiture on the said renewal transaction of April 5, 1932 include the principal of the said two small notes, as well as the interest on the entire $1300?

Recurring to the illustration previously used, i. e., if the transaction had been embraced in one note for $1300 with installment payments, and the service charge of one dollar for each of the six small installments had been made, this would not have amounted to twenty per cent on the real amount evidenced by the note, and the principal of the installments which were only a part of the actual debt would not be forfeited. So here, although in form several notes were taken, the interest, including the service charge, must be referred to the whole actual debt, —to the substance of the transaction rather than to the mere form by which it was evidenced; wherefore, the principal of the debt evidenced by the two small notes was not forfeit.

On November 1, 1932, the small notes aforesaid with all interest and service charge thereon having been paid, together with the charged interest on the $1150 note, the transaction was again renewed, without deducting therefrom or crediting thereon the said usurious interest. Payments of usurious interest are by operation of law payments on the principal of the balance of the debt due. Brewer v. Jones, 131 Miss. 545, 559, 95 So. 519. And notes given for a greater sum than was legally due are usurious, if the interest on the real debt exceeds eight per cent. Hyde v. Finley, 26 Miss. 468; Burt v. Brashears, 118 Miss. 339, 79 So. 182. When the taint of usury has attached, all subsequent payments of interest or for service charges are credited by law to the principal throughout all subsequent renewals so long as the identity of the subject matter is preserved or is traceable as belonging to the original debt. Hardin v. Grenada Bank, Miss., 180 So. 805, 811. It follows that all payments of interest and service charges since April 5, 1932 down to and including the last of such payments in the entire of the succeeding series in this transaction are to be credited on the principal of $1300 as that principal existed on that date.

There remains to be noticed two other contentions: Appellee bank says that in making the service charges which we have heretofore mentioned,—and there were others of such charges, sometimes of one dollar and sometimes fifty cents, later in the course of the chain of renewals,—there was no wilful or intentional design to violate the law and, therefore, that no penalty of forfeiture of all interest thereupon and thereafter should be visited upon it. Good faith and the absence of unlawful intention is conceded by appellant; but there is no denial that the bank intended to make the service charge. The effect of the statute is to prohibit such a charge; and it was not necessary that, in doing what it intended to do, the bank should have known that the law was being thereby transgressed. All persons in doing what they intend to do

are held to the legal consequences of the act intended. Neither law nor government could function upon any other basis. Chandler v. Cooke, 163 Miss. 147, 137 So. 496.

Finally, appellee says that the trifling sum of one dollar or sometimes fifty cents added as a service charge should be disregarded by the court under the maxim de minimis non curat lex. If these charges are so trifling that the court should close its eyes to them, they are so trifling that banks should not insist upon them as conditions of making small loans to the worthy citizen entitled by character and standing to the needed accommodations of such loans. We do not fail to recognize that the contention is that to each separate borrower of these small amounts the service charges are not large, but that the aggregate of such charges on a considerable number of such loans produces an amount which prevents loss to the bank on them. At the same time, the aggregate to the bank is the same aggregate of loss to all the borrowers, and a legal wrong can be no less a wrong merely because its effect is diffused among several instead of falling upon one alone.

Reversed and remanded.

**Smith, C. J.,** delivered an opinion concurring in part.

I concur in the opinion of Judge GRIFFITH except as to the method there adopted for determining whether the $1150 note of April 5, 1932, bore usurious interest. That note was one of several notes given in renewal of a debt for $1300, on the whole of which debt the appellee was entitled to charge eight per cent interest per annum; and the aggregate of the interest charged on all of these notes for this debt of $1300 must exceed eight per cent for any usury to have been charged on the whole, or any part of the debt.

In other words, whether one or more of the notes bore more than eight per cent interest is immaterial, unless this excess over eight per cent, when added to the interest charged on the other notes, exceeds eight per cent. This difference in method is material; for had the $1150 note borne only six per cent interest, the fact that other of the notes bore more than eight per cent interest would not render them or any of the other notes usurious unless this excess was more than eight per cent on the entire $1300, or when added to the six per cent interest on the $1150 note would have been more than eight per cent on the whole debt. Since all of these notes bore eight per cent interest, the service charges, which were in fact interest, on some of the notes, resulted in more than eight per cent being charged on the entire debt of $1300. This is the method here pursued in determining that the principal of the small notes, on which more than twenty per cent interest was charged, was not forfeited.

**McGowen, J.**, delivered an opinion dissenting in part.

I dissent in part only from the majority opinion.

The bank collected on a note due one year after date, with interest at the rate of eight per cent for 360 days as a year, and in addition thereto collected interest for five days additional at eight per cent. This was knowingly done.

In this state, under the existing statute, 365 days constitute a year. From that time the contract was tainted with usury.

The case of Planters' Bank v. Snodgrass, 4 How. 573, 5 Miss. 573, has no application to the facts of this case. The statute defining a year was not in existence. It is now; and the courts and the banks are controlled by it.

The case of Cox v. Timlake, 169 Miss. 568, 153 So. 794, dealt only with a fractional part of a year, and, therefore, is not controlling here as we are not dealing with a fraction of a year, but an entire year.

As to usury and its application to the case at bar subsequent to April 5, 1932, I am in accord with the majority opinion.

**Ethridge, J.,** delivered an opinion dissenting in part.

I dissent from the majority opinion in two respects: First, I think the charging of interest for 360 days, as a year, and then for the five extra days as a fractional part of a year, violates our statute, and constitutes usury; second, I think that when that transaction was divided up in renewal by taking different notes, having different dates of maturity and, in the case of some of the notes, having different dates, it was a dividing of the transaction into several independent transactions, each standing independently of the others, although all of them arose out of the same original consideration. In other words, I think that the interest on the various $25 notes, with their service charge, constitute usury; and that since on the first two of them the interest, considering the service charge as interest, exceeds 20%, they were forfeited. But the large note, bearing 8% on its face, was not usurious as it stood, until its renewal and the inclusion in the renewed note of the amount of the excessive interest on the small notes, with the forfeiture of two of them, which should have been credited on the amount of the debt, and then a renewal of the balance. The case of Planters' Bank v. Snodgrass, 4 How. 573, was decided, so far as constituting a year out of 360 days, or twelve months of thirty days each, is concerned, when there was no statute defining in what a year consists; and was decided upon the law of usage or custom, as part of the law merchant, being a part of the common law, although in some respects different from the common law, and based on the customs of merchants. Our statute pertinent here is section 1946, Code of 1930, which reads as follows: "The legal rate of interest on all notes, accounts and contracts shall be

six per cent per annum; but contracts may be made, in writing, for a payment of a rate of interest as great as eight per centum per annum. And if a greater rate of interest than eight per centum shall be stipulated for or received in any case, all interest shall be forfeited, and may be recovered back, whether the contract be executed or executory. If a rate of interest is contracted for or received, directly or indirectly, greater than twenty per centum per annum, the principal and all interest shall be forfeited, and any amount paid on such contract may be recovered by suit."

The words "per annum" are synonymous with the words "per year," and the statute nowhere makes an exception from the definition of a year, contained in section 1393, which reads as follows: "The term 'year,' when used in any statute, means a calendar year, unless a contrary intention be expressed." This statute, defining what constitutes a year and what constitutes a month, was first enacted in the Code of 1857, while the case of the Planters' Bank v. Snodgrass, supra, was decided at the January term, 1840, and it was manifest that the statute was enacted to overcome the decision in that case. The statute was overlooked by both counsel and court in the case of Cox v. Timlake, 169 Miss. 568, 153 So. 794, and consequently the Court's attention was not directed to, nor did the Court in its own research discover, the statutory change; and consequently that decision should not be adhered to, in the face of the provision of the statute.

Under the Code of 1848 (Hutchinson's), the law in force when the Planters' Bank Case was tried, what constitutes a year was not defined, but the rate of interest was fixed on the basis of $8 per hundred per annum. The opinion in that case was directly founded on the custom of banks, and other institutions then existing, of calculating interest on a basis of twelve thirty-day months, constituting a year of 360 days. There was also a little difference in the verbiage of the statute of 1840 and that of 1892, and on to 1930. The prior statute on interest was

based on stipulation or agreement, and did not contain the words in the present statute, "or received." In other words, in the former statute it was provided that if a rate of interest in excess of that allowed in the statute is contracted for, the interest should be forfeited. In the Snodgrass Case, supra, the Court gave emphasis to the words "contracted for," and held that there must be an agreement or understanding in the way of a contract to receive greater interest, and that mere payment of interest in excess of the legal rate did not operate as a forfeiture. In the Snodgrass Case the Court said: "In order to constitute the offense of usury, there must be an agreement between the lender and the borrower of money, by which the latter knowingly gives or promises, and the former knowingly takes or reserves, a higher rate of interest than the statute allows, and with an intention to violate the statute. There must be an agreement, and this is in all questions of usury the first thing to be considered."

Under the present statute, if the lender knowingly receives interest in excess of the legal rate, he forfeits all interest though there was no stipulation for such payment. I think this change is important, and that the decisions of the Court bear out this opinion.

In the course of the majority opinion in Planters' Bank v. Snodgrass, supra, it was said: "It has been argued that usage cannot excuse a wilful violation of the statute laws of the country, or furnish an apology for trampling them down. This is unquestionably true. And yet custom may go a great way to explain a transaction and unfold the motives of the parties to it. As was determined by Lord Mansfield in the case of Floyer v. Edwards, already cited [1 Cowp. 112]. In this case the motive is the gravamen of the controversy. And surely the party who is sought to be charged on a corrupt motive is entitled to the benefit of every circumstance which in its nature is calculated to repel the imputation. For this purpose he

may invoke the usage which influenced the obnoxious act, and ask to have it put in the balance and weighed in his favor. The argument it furnishes is, that it is not fair to impute a wicked intention, for doing an act, which is every day committed by almost every bank, merchant, broker and business man in the United States. An act sanctioned not only by inveterate usage, long continued, and generally diffused through the operations of the almost entire banking and commercial classes of the whole country; but by a solemn legislative enactment of Congress, and of several of the states of the Union. He may ask the benefit of the custom, for the same reason and for the same purpose, that the banker does, who takes the interest on his loans in advance. Its influence in the latter case has never been denied, but on the contrary was admitted by Lord Mansfield in the case before noticed of Floyer v. Edwards, when the question was of first impression. He held the transaction to be usurious upon its very face, yet as the interest was discounted in pursuance of long usage in the regular course of trade and business, it would not do to hold it usurious. . . . Banks have in most cases adopted the practice of including the day of payment fixed in the old note, in the new one upon a renewal; by which they receive double interest for that day. On the day of the date of the renewal they get 12 per cent. Every bank knows this, they then in such cases knowingly take usurious interest. And are therefore clearly within the operation of the general rule laid down in the adjudged cases, and exactly within the pale of the one asserted by Judge SAVAGE in the case of the Bank of Utica v. Wager (2 Cow. (N. Y.) 712). . . . He concluded, however, that as the practice of counting interest on 360 days for the year, had not then received a judicial sanction, and was res integra, that the reservation of an excess under it tainted the contract with usury. But I apprehend the principle of each case is identical—save that in the two former the sin is much more aggravated.

In one, the bank takes 36 cents in every hundred dollars more than the law allows; and in the other, when she includes the same day in the two notes, she gets exactly two-fold interest. Yet these transactions have been universally excused by the courts on the authority of custom.''

It would seem from these excerpts that the Court was accepting the customary usage of banks and other financial institutions in treating 360 days as a commercial year, and there was no statute then in force to direct the Court to treat a year as being composed of 365 days, as is now the case. However, in Planters' Bank v. Snodgrass, Judge SHARKEY, The John Marshall of Mississippi Jurisprudence, dissented, and with all the logic of his luminous mind exposed the fallacies of the reasoning of the majority of the Court. I quote a few extracts from Judge SHARKEY's dissenting opinion: ''First, then, was the contract usurious? This question cannot be satisfactorily determined, without first ascertaining what it is that constitutes usury. It is defined by counsel to be a corrupt agreement, whereby the lender receives or reserves, and the other pays or agrees to pay, a greater rate of interest than the law allows. It is said the corrupt intent must exist, and must have entered into the inception of the contract; and that without this ingredient usury cannot exist. This is also the definition, in substance, which is given in the books. It had its origin under the British statutes, which made the usurious contract void, and the act an offence punishable by penalties and forfeitures. It is not a crime under our statute. But to adopt the definition as applicable here, and suppose it to be a corrupt agreement to take more interest than the law allows, this is still an unsatisfactory explanation, and before it can be properly applied to the facts of the case at bar, its constituent parts must be understood. Before we can understand the aggregate, we must understand the particular parts. What, then, is meant by corrupt agreement, or in what

does the corruption consist? I maintain and shall endeavor to show that it consists merely in the act of taking illegal interest, whether it be known to be illegal or not; in other words, in taking more than eight per cent. without accident or mistake. If the lender knows what he does take, the offence is complete. It is knowingly taking, opposed to taking by accident or mistake. There is nothing else to which the term corrupt can be applied, for there is no moral turpitude in the mere act of taking interest; it does not evince depravity. . . . In the case of the Bank of the United States v. Waggener (9 Pet. 378, 9 L. Ed. 163), Judge STORY says, 'To constitute usury within the prohibitions of the law there must be an intention knowingly to contract for or take usurious interest; for if neither party intend it, but act bona fide and innocently, the law will not infer a corrupt agreement.' The import of this language is neither obscure nor doubtful. There are two members to this sentence. By the first we are told what usury is, by the second we are told when the law will not infer it. The last does not qualify the first. The act which constitutes usury is not changed, because the law will not infer it when the parties act innocently. He says 'if neither party intend it;' intend what? 'knowingly to contract for or take usurious interest,' of course. If illegal interest be taken, it does seem to me that according to this language, there is but one way of escaping the charge of usury, and that is by showing the absence of 'an intention knowingly to contract for, or take usurious interest,' and if the party had no intention knowingly to contract for it, it would seem to follow that the only other way it could happen, would be by accident or mistake. I apprehend that he did not mean to assert the proposition that the party must know that he was violating the law, but merely that he should know for what sum he contracted. He continues, 'when indeed the contract upon its very face imports usury, as by express reservation of more than legal interest, there is no room for presump-

tion, for the intent is apparent, res ipsa loquitur.' What is it that rejects presumption? The intention knowingly to take a certain interest. If presumption is to be rejected when the facts are apparent from the contract the case is precisely the same when they are made to appear otherwise. Whenever it is shown, therefore, that the parties acted knowingly, the law pronounces the agreement corrupt, precisely as though the intention had appeared on the face of the contract.''

On pages 637 and 638 of the Mississippi Report he further says: ''Taking intentionally, or, what is the same thing, knowingly, as contradistinguished from taking by accident or mistake. This is shown to be the true understanding of the decision by the subsequent language of the court. The judge says, 'Ignorance or mistake of law excuses no man, but a mistake of fact does excuse.' From this I conclude that nothing will excuse usury but mistake of fact. If there be no mistake of fact, but a taking intentionally or knowingly of more than 8 per cent. it is usury. . . . Ignorance of the law affords no excuse, nor does want of intention to violate the law, because such an intention constitutes no ingredient in usury. And certainly it would afford no defence for the usurer to say, that although I knowingly took more than 8 per cent. I did not intend to violate the law. That instead of being a defence, would make the case conclusive, as usury, like most other things, certainly admits of positive proof. When it is shown that more than 8 per cent. was taken, that is prima facie evidence of usury, but when it is shown that it was intentionally and knowingly taken, that is positive proof of usury, and admits of no excuse. Two plain questions answered affirmatively must settle the question of usury. 1. Did you take more than 8 per cent. interest? and, 2. Did you know that you were taking it?''

At the bottom of page 640, and top of page 641, the learned judge says: ''It appears that interest was cal-

culated for the whole time the note had to run (eighteen months), at three hundred and sixty days to the year, and that the officers of the Bank knew that this gave a fraction more than the ordinary mode of calculating at three hundred and sixty-five days to the year. These facts being found by the verdict, are to be considered precisely as though they had formed a part of the written contract, and must be so expounded. Do they constitute a corrupt agreement? They do. There is here nothing left for the law to infer; the facts are placed before the court as part of the contract. The intention of the lender is made apparent by the verdict, and here the maxim res ipsa loquitur applies. The jury have told the court that the Bank officers knew that they were taking more than legal interest. The intent is found; the law pronounces a contract made with such intent to be corrupt. The intention of such parties was a question of fact for the jury; the effect of contracting with such intention is a question of law for the court."

There are many other striking passages in this opinion, but I shall not pursue it further.

Mr. Blackstone in his Commentaries, at page 75, under the head "Law Merchant," says: "To this head may most properly be referred a particular system of customs used only among one set of the king's subjects called the custom of merchants, or lex mercatoria; which, however different from the general rules of the common law, is yet engrafted into it, and made a part of it; (b) being allowed for the benefit of trade, to be of the utmost validity in all commercial transactions; for it is a maxim of law, that 'cuilibet in sua arte credendum est' (every man is to be credited in what concerns his own profession)."

On page 76 he says: "When a custom is actually proved to exist, the next inquiry is into the legality of it; for, if it is not a good custom, it ought to be no longer used; 'Malus usus arbolendus est' (a bad custom should be

abolished) is an established maxim of the law. To make a particular custom good, the following are necessary requisites. 1. Length of usage.—That it have been used so long, that the memory of man runneth not to the contrary. So that, if anyone can show the beginning of it, it is no good custom. For which reason no custom can prevail against an express act of parliament, since the statute itself is a proof of a time when such a custom did not exist.''

This passage shows that custom cannot operate contrary to statute; and that, as I understand it, is the law everywhere. The legislature enacts the statute, and the legislature alone can change the law which it has enacted. Such enactments are frequently for the very purpose of changing or overturning the customary or common law. The common law has been said to be perfection of reason; and when it ceases to be the perfection of reason, and operates contrary to reason, the legislature may change it, or the courts may change the common law, to accommodate it to the change of custom among the people, which has existed beyond the memory of living man. But the courts have no right to change the statutes, or to permit custom to overturn them.

In 2 Words and Phrases, First Series, p. 1326, under heading ''Common Law,'' are many quotations from decisions bearing on the common law, one of which is, ''The common law has been aptly called the 'lex non scripta,' because it is a rule prescribed by the common consent and agreement of the community as being applicable to its different relations, and capable of preserving the peace, good order, and harmony of society, and rendering unto everyone that which of right belongs to him. Its sources are to be found in the usages, habits, manners, and customs of a people; its seat in the breast of the judges who are its expositors and expounders. Every nation must of necessity have its common law, let it be called by what name it may, and it will be simple or

complicated in its details as scoiety is simple or complicated in its relations. A few plain and practical rules will do for a wandering horde of savages, but they must and will be much more extensively ramified when civilization has polished, and commerce and arts and agriculture enriched, a nation. The common law of a country will therefore never be entirely stationary, but will be modified and extended by analogy, construction, and custom so as to embrace new relations springing up from time to time from an amelioration or change of society.'' Jacob v. State, 3 Humph. (Tenn.), 493.

Again it is said, 2 Words and Phrases, First Series, on page 1330, ''The term 'common law' is constantly and generally used in contradistinction to 'statute law.' It is used in such sense in Act 1776, providing a scheme of descents, and providing that, in all cases of descent not provided for by the act, the common law shall govern. 'If it had been intended to recognize any state enactments of England, we should usually expect to find some clear expression of such an intention by some appropriate words.' ''

It is universally recognized that the statute prevails over the common law, that the statute displaces the common law to the extent of giving full effect to the purpose of the statute. When our legislature enacted the statute defining a year, and providing that it should be understood to mean a calendar year unless something in the statute indicated to the contrary, and when it prescribed the rate of interest on the basis of per annum, or per year, it was clearly intended to require a year of 365 days, known as a calendar year; and not a year made up of twelve 30-day months. See 8 Words and Phrases, First Series, p. 7552, and following pages; also, 71 C. J. 648, and notes; and Thornton v. Boyd, 25 Miss. 598.

In Blackstone's Commentaries, Book 2, chapter 9, page 141, it is said: ''The space of a year is a determinate and well-known period, consisting commonly of 365 days;

for though in bissextile or leap-year, it consists properly of 366, yet, by the statute 21 Henry III, the increasing day in the leap-year, together with the preceding day, shall be accounted for one day only. That of a month is more ambiguous, there being, in common use, two ways of calculating months; either as lunar, consisting of twenty-eight days, the supposed revolution of the moon, thirteen of which makes a year; or, as calendar months of unequal lengths, according to the Julian division in our common almanacs, commencing at the calends of each month, whereof in a year there are only twelve. A month in law is a lunar month, or twenty-eight days, unless otherwise expressed; not only because it is always one uniform period, but because it falls naturally into a quarterly division by weeks. Therefore a lease for 'twelve months' is only for forty-eight weeks; but if it be for a 'twelvemonth' in the singular number, it is good for the whole year. For herein the law recedes from its usual calculation, because the ambiguity between the two methods of computation ceases; it being generally understood that by the space of time called thus, in the singular number, a twelvemonth, is meant the whole year, consisting of one solar revolution.''

It is therefore easily seen that, the legislature having defined the year to mean a calendar year when not otherwise limited, and not having otherwise limited it in the statute on interest, we should distinguish the case of Planters' Bank v. Snodgrass, supra, from this case, and overrule Cox v. Timlake, supra.

On the second proposition, I desire to say that on the 5th of April, 1932, the original debt had been paid down to $1300, on which date the amount due was divided into several notes, one for $1150, due November 1st, 1932, with 8% interest from date, and six notes for $25, each, due respectively in a series of one to six months after date, with the full 8% interest on the small notes, plus a $1 service fee for each of the said six notes. The new

notes were, by the act of the parties, made separate transactions and separate contracts, each having its own stipulations and agreements, capable of being paid as separate transactions by a simple endorsement of each, or by one endorsement on one and another endorsement on another, becoming for all purposes, other than the consideration upon which they were founded, separate and distinct contracts, one in nowise dependent upon the other. Suit could be maintained on one note without regard to the other notes; one note might be in the hands of one party who would desire to sue and reduce it to judgment, while the others might be in the hands of other parties who might desire to keep them and retain the interest accruing thereon until the maker desired to pay it off. Our Court has held in several cases that one holding notes of the same person, maturing at different times, may sue separately thereon in a justice of the peace court, although the amount of the notes, taken together, was enough to confer jurisdiction in the circuit court. See Rubenstein v. Foote-Patrick Co., 149 Miss. 128, 115 So. 194; Drysdale v. Biloxi Canning Co., 67 Miss. 534, 7 So. 541; McLendon v. Pass, 66 Miss. 110, 5 So. 234.

The holder of the notes, although all were held by the same person, could have sued on one, and not on another, although all might have been due at the time of the institution of the suit; and it was clearly the intention and purpose of the parties to make them a separate transaction, and there was nothing in the law to prevent their so doing. Consequently the note for $1150, bearing only 8%, was not tainted with usury, while the six small notes were. But when the $1150 note was renewed without crediting the interest and the two forfeited notes on the amount due, and 8% was charged on the full amount, from thence forward the whole became tainted with usury, and the interest was forfeited.

It was the duty of the holder of the $1150 note, when he went to renew it, to credit on that note the payments

that had been made to him on the small notes in excess of what, under the law, he was entitled to collect. Jones v. Brewer, 146 Miss. 142, 110 So. 115.

I concur in the reversal of the judgment, but I think the views I have expressed should be made applicable to the case when it is retried in the court below.