STATE OF DELAWARE *v.* BANKERS FINANCE CORPORATION, a corporation of the State of Delaware, and others.

(*April* 29, 1942.)

RODNEY and SPEAKMAN, J. J., sitting.

*James R. Morford,* Attorney-General, and *Thomas Herlihy, Jr.,* Deputy Attorney-General, for the State.

*H. Albert Young* for the defendants.

Court of General Sessions for New Castle County, Indictments Nos. 57, 58, 62 and 63, May Term, 1940.

RODNEY, J., delivering the opinion of the Court:

From the foregoing facts there is presented the propriety of the following charges or course of conduct by defendant:

1. (a) The amount required as insurance premium on the automobile taken as security for the loan, and

(b) the related question as to whether, if insurance was effected by the lender (as an agent for the insurer) and it received commissions on such insurance premiums, whether such commissions should not inure to the benefit of the borrower.

2. Whether the investigation fee or service charge of

2% provided by the Act was one allowable fee regardless of the term of the loan, or whether it should be computed on an annual basis.

3. Whether upon payment of a loan or a substantial part of it before maturity the lender should rebate the proportionate part of the interest discounted in advance.

Before entering upon a discussion of the propriety of the actual and specific charges made by the lender it is necessary to give some consideration of the purpose of the Delaware Act and to determine, under that Act, the propriety of any charge whatever against the borrower, other than the interest and service charge as set out in the statute.

Beginning about 1900 public consciousness became aroused as to the evils of unrestricted "small loan" transactions, and the inordinate profits exacted by a group called "loan sharks", from a class of people whose limited financial and social standing and lack of credit prevented their withstanding the unconscionable demands made upon them. Legislation controlling the business was adopted in almost all of the States, and exhaustive surveys were made under the leadership of the Russell Sage Foundation and other social and economic agencies. These laws to 1938 are collected in Camalier's Personal Finance Laws, and hundreds of cases are collected in Hubachek's Annotations on Small Loan Laws.

The constitutionality of "small loan" acts has been sustained by a myriad of cases, including the Delaware case of *State v. Wickenhoefer,* 6 *Penn.* 120, 64 *A.* 273.

Between 1916 and 1936 some six drafts of a so-called Uniform Small Loan Act were prepared, and the legislation of most of the States is based upon some one of these drafts. The salient features of the Uniform Act, insofar

as of interest in this case, are that the Act applies to loans not exceeding $300.00; that interest at rate of 3½% per month may be charged on such part of the loan not exceeding $100.00, and 2½% upon the portion above that sum; that interest may not be charged in advance or compounded, and shall only be paid on unpaid balances. The first four drafts included fees actually paid out to a public officer for recording or releasing any instrument securing the lien, but the later drafts seem silent as to this point and affirmatively cover only interest.

■ We now come to the consideration of the Delaware Act. Its structure and provisions differ widely from the Uniform Act, but we may assume its general purpose was the same, viz. the protection of needy borrowers of small sums, and to furnish them with the opportunity of borrowing through a system of regulated lenders. The limitation of profits of the lenders is largely a method of attaining the primary purpose of limiting the burdens of the needy borrower. The Delaware Act covers loans not exceeding $500.00; it provides for registration of those in the business of making small loans, and for supervisory jurisdiction of the State Bank Commissioner. It allows loans to be made payable in weekly, monthly, or other periodical installments, with the lender taking the obligation of the borrower, with any security that may be acceptable to the lender. The Act provides that the lender may charge in advance the legal rate of interest of 6%, and an investigation fee or service charge of not exceeding 2 per centum of the amount of the loan. The Act then provides "no additional interest or commission shall be charged nor shall any additional charge of any kind be made * * *." It is around the quoted words that all the difficulties cluster. Do the words "any additional charge of any kind" refer to some charge or increment which, in any way, could inure

to the benefit of the lender, or do they, as contended by the State, prohibit any charge at all against the borrower, even though made at his request and payable to a third person, and as to which the lender has no beneficial interest of any kind whatever? Similar words in other and analogous provisions have not received a uniform construction, and the true meaning of the words can best be had by a consideration of the history of our Act and of the pertinent decisions of other States.

The first Delaware Act concerning small loans was approved March 29, 1905 (Vol. 23, c. 149, p. 256). Section 3 provided that on loans not exceeding $100.00 the legal rate of 6%, together with an additional 5% could be charged "and no further interest, commission or charge shall be made." Section 5 provided that either a registered or unregistered lender should be guilty of a misdemeanor who should, on a loan of $100.00 or less, exact, require or demand interest in excess of 6%, together with an additional sum of 5% per annum "whether said additional sum be in the form of interest or for services rendered or expenses incurred."

The constitutionality of the cited statute was sustained in *State v. Wickenhoefer*, 6 *Penn.* (22 *Del.*) 120, 64 *A.* 273, 281, it being the only decision of this State on the Small Loan Act. In the course of its opinion the Court said that the Legislature intended "that such additional 5 per cent. should cover all extra charges, including those for services rendered and expenses incurred." Several observations on the Act and the construing decision may be made. In considering the constitutionality of the Act, the Court had before it only an unlawful interest charge. It was not considering a charge for any thing other than interest, for the indictment in the case covered only the interest charge. The Court said:

"It is manifest that the Legislature believed that excessive and unlawful rates were exacted under the guise of 'services rendered' and 'expenses incurred'."

That it was the amount exacted from the borrower and accruing to the lender, or for his benefit, that was intended to be controlled by the Act is shown by the use of the term "under the guise of 'services rendered' * * *" as well as by the language of the preamble of the Act. The word "guise" has a meaning of cover or cloak as indicating that the charges for services were a cover or cloak for sums coming into the hands of the lender. So in the preamble of the Act it is stated

"Whereas, the charges imposed * * * are in excess of the legal rate of interest in this State, affected (sic) by *imaginary* services rendered in the form of searches, attorneys fees, &c."

The very use of the words "imaginary services" strongly indicates that it was the return to the lender that was being controlled by limiting the interest of the lender in the amount of the charges.

The present Act was approved April 15, 1935 (Vol. 40, p. 765), and we think should receive such a construction as will carry out its obvious purposes, but not such a rigid construction as will defeat the very purposes of the Act and make it impossible for poor persons to obtain a small loan even though possessed of sufficient security.

We think that a proper construction of the Act requires that a lender shall not exact, require or receive, beyond the statutory charges, any amount whatever which may, as a charge or condition of the loan, accrue to him or for his benefit in any manner whatsoever. A few instances

will make clear our meaning. It is well established that lenders under the Small Loan Acts, taking advantage of the increased interest and other returns provided by the Act, are limited and restricted by the terms of the Act as to the charges, and there are certain expenditures which would be entirely proper under ordinary loan transactions, but are not allowable under statutory Small Loans. In other words, no lender can take the higher returns of the Small Loan Act with all the benefits of the general law, and discard the limitations of the Small Loan Act. If a lender wants the higher returns of the Small Loan Act he must take it "cum onere" with its restrictions and limitations.

In an ordinary loan by mortgage on real estate it is, we assume, quite customary for the lender to insist on an examination of title, the cost of which is borne by the borrower. This charge against the borrower would not be proper in a Small Loan transaction. The borrower does not benefit by the search and his title is in no way improved thereby. The benefit accrues solely to the lender. So it is with certain other fees. Proper, perhaps, in an ordinary loan, they become improper in a Small Loan transaction, when expended in the interests of the lender.

Of a different nature, we think, is insurance protection and the matter of recording fees. An insurance policy in the name of the borrower covering the value of the insured property, even though payable to the lender for his interest, is clearly of benefit to the borrower. If the loan should be repaid the policy remains solely for the benefit of the borrower. If loss occur and payment be made on the policy, the borrower is a beneficiary, even though the proceeds of the policy be paid to the lender, for such payment discharges or reduces the obligation of the borrower.

We speak, of course, of insurance protecting the value

of the thing insured, and not merely insurance for the protection of the lender's interest.

We shall now consider the charges made by the present defendant:

1. It is contended by the State that premiums for insurance on the security may not be charged at all against the borrower because of the restrictive terms of the statute, which provides that except for the interest at 6%, payable in advance, and 2% investigation fee or service charge, "no additional interest or commission shall be charged nor shall any additional charge of any kind be made." We have already briefly indicated our views on this point. Under the Uniform Act the pertinent decisions are not harmonious. The lower courts of New York, in at least three cases under the Small Loan Act, Banking Law, Consol. Laws, c. 2, § 352 et seq., have held that charges for insurance premiums are not allowable under the Act. *Wessler v. Jefferson Personal Finance Corp.*, (*Mun. Ct.*) 26 *N. Y. S. 2d* 132; *Pollack v. Madison Long Island Personal Loan Co.*, 176 *Misc.* 78, 24 *N. Y. S. 2d* 950; and *Krulik v. Confidential Personal Loan Co.*, 176 *Misc.* 138, 26 *N. Y. S. 2d* 676. The Supreme Court of Michigan, on the other hand, under almost precisely the same statute, in *Platz v. Lapinski*, 263 *Mich.* 240, 248 *N. W.* 607, held that an insurance premium was a proper charge under the Small Loan Act, Comp. Laws 1929, § 12198 et seq., where none of the money so applied went to the lender. To us it seems the latter is the proper rule, especially where the statute, like ours, allows the lender to take security for the loan. No authority to take security would seem to be needed if the cost of such security must be borne by the lender. Assuredly, any one can take security for a loan by him if he is to pay all the expense of the security. The following example may not be without some pertinency. An indigent owner of an

automobile seeking a small loan offers the automobile as security. Unable to obtain the loan without insurance, the owner, if possible, borrows the amount of the insurance premium from a third person, to be repaid when the original loan is completed. This probably can seldom be done. Perhaps even the small loan broker could make a secondary loan solely for the amount of the insurance premium, and to be used for that purpose, with the result of a possible duplication of service charges. This circuitous procedure seems to us unnecessary and improper, having in mind the purposes of the Act, that the needy borrower may obtain his loan on the lowest terms, and that the payment of the insurance premium inures to the benefit of the borrower and no part goes directly to the benefit of the lender, but merely as potential indemnity in case of loss or damage to the security.

1. (b) We now come to a question closely related to the matter of insurance premiums, viz. that where the lender is also an agent of the insurer and obtains commissions on insurance written by him, whether the value of such commissions should in some manner or degree be passed on the borrower. It would seem that the matter should be considered from two angles (a) as to whether no commission on the insurance should be charged at all by the lender, and (b) as to whether such commissions being received by the lender, these commissions should be divided with or credited to the borrower.

(a) It would seem obvious that commissions need not be waived. The borrower having paid the premium it is of no benefit to him that the insurer should obtain the business without paying out any agent's commissions. The sole benefit in such case would be to the insurance company.

(b)   The effect of the commissions when received by the lender presents a somewhat more difficult question.   The borrower having paid the insurance premium at the standard minimum manual rate for borrowers or non-borrowers, the subsequent allowance of commissions to the lender has not increased the charge to the borrower. It has, however, increased the profit to the lender.  We are familiar with the line of cases holding that any added benefit to a creditor from any collateral agreement or transaction entered into as a condition of a loan constitutes usury if lawful interest is thereby exceeded.   66 C. J. 232. We are not directly considering a question of usury, but construing a statute making it a criminal offense to make excessive charges against a borrower.   The subject matter of the statute, however, has a direct connection with usurious practices, and we think certain principles concerning usury may, by analogy, be applied.  Any increased profits accruing to a lender which are the result of compulsion or exaction as a condition of the granting of a loan are, we think, unlawful.   So we think that questions of insurance premiums and commissions thereon are largely questions of fact.   We have determined that a borrower tendering an automobile as security may be required to furnish insurance on such automobile.   That being true we think the borrower, within certain limits concerning the stability and soundness of the insurer, may select his own insurance company.   If a lender compel a borrower to insure in a company where the lender will get additional commissions, we think such conduct constitutes an unlawful exaction.   If, on the other hand, no compulsion whatever is used, but the selection of the insurance company is made by the borrower and such selection results in an agent's commission to the lender, whether the premium be paid by the borrower himself or by the lender at request of the borrower, we see no reason that these commissions should be credited to the

borrower. He has no expense in maintaining the agency and has paid but the normal manual rate. There being in this case no evidence of any compulsion in the selection of the company, we do not think the failure to apply the commissions to the account of the borrower constitutes any unlawful charge against the borrower.

2. We now come to a consideration of the charge of 2% of the amount of the loan which the statute calls an "investigation fee," or "service charge." Is it one fixed charge to be made at the inception of the loan, regardless of the term of the loan, or is it to be viewed upon an annual basis? The matter is not without difficulty, owing to the language of the statute. The phrase "an investigation fee" contains an element of initial inquiry as to the integrity and character of the borrower, which is ordinarily determined at the time of the making of the loan. A "service charge," on the other hand, might indicate the cost of materials or supplies in setting up the account, as well as compensation for the bookkeeping entries made necessary by the loan, and these continue to exist and to be a charge while the loan remains upon the books. In *Dickey v. Bank of Clarksdale*, 183 *Miss.* 748, 184 *So.* 314, the Court considered a "service charge" as interest under another name. The matter has importance in connection with the terms of loans. If a loan be made for a month or for a few months, and a fixed charge of 2% be made, the return is vastly different than if the loan be made for a term of a year or more. If money be loaned in successive periods of one month, each, the investigation fee or service charge would be 25% per annum as against two per centum if the charge be on an annual basis. On the other hand, in a 24 months loan, as the present, the lender would be entitled to two 2% fees if the charge be on an annual basis, and to but one 2% if the charge be but a flat fee. In the statute there are two al-

lowable charges—one of "6 per centum of the amount of the loan" for interest, and the other of "2 per centum of the amount of the loan" as a fee or charge. The first allowance is clearly on a "per annum" basis, and whether the Legislature used the second term in a different sense would present a debatable problem. We think, however, it would be improper for us to determine this question. The admitted facts show that the lender charged but $57.36 for interest and service charges on the loan, and this amount is less than the allowable sum of two years interest in advance on the amount of the loan ($49.90) and one year's service charge of $8.32, or total of $58.22. There is nothing in the case to show that more than one service charge of 2% was made, although it is possible that there were two service charges made, but if this be true there was the consequent reduction in the amount charged as interest. To constitute usury it is essential that something in excess of the legal maximum be exacted, and if the total exacted does not exceed the allowable amount there is, we think, no usury and, we think, there has been no charge against the borrower so illegal as to constitute a crime.

Under a statute (Sec. 2287, Revised Code of 1935) the State Bank Commissioner is authorized to have supervisory jurisdiction over Small Loan operators, with power to enforce necessary rules and regulations. Some of the rules thus promulgated are set out in the Brief of Counsel. Until the statute is clarified by the Legislature the State Bank Commissioner has ruled that the investigation fee or service charge shall be one charge of 2% regardless of the term of the loan.

3. Where a loan has been repaid in whole or in part, before maturity, must the lender rebate to the borrower a proportionate part of the interest discounted in advance?

From the facts it would appear that the loan of $415.86 was made on Sept. 27, 1939, at which time the borrower paid to the defendant, the lender, the interest for two years in advance; the lender took a lien on the borrower's automobile, with insurance thereon; a few weeks after the loan was made the automobile was seriously damaged and the lender shortly after Nov. 9, 1939, received from the insurance company the sum of $400.00, which it credited on the loan and released the lien, allowing the borrower to receive the salvage of $125.00. The lender did not rebate to the borrower the interest which it had received in advance, and it was the failure to do this that occasions the present question. In 27 R. C. L. 235, it is said "It is generally agreed that the acceptance of payment of a debt before maturity with interest to the date of maturity does not constitute usury." For this may be cited *Smithwick v. Whitley*, 152 *N. C.* 366, 67 *S. E.* 914, 915, 28 *L. R. A.* (*N. S.*) 113, 20 *Ann. Cas.* 1348, and the principle is declared to be that "where there is no right to demand payment, there can be no forbearance, and, if no forbearance, no usury." We are speaking of legal obligations, not moral requirements. In the cited case Lord Ellenborough is reported to have once said in a similar case "The defendant's conduct may not be liberal or praiseworthy, but it is not usury." In the principle and instances above cited the payment before maturity was a voluntary one by the borrower. Is there a distinction between such a case and the instance of a payment to a lender by an insurance company of the amount of the insurance loss which is credited by the lender to the debt of the borrower? In such case the borrower is not personally making the payment, but the payment is being sought and demanded by the lender, and if the payment be not required or desired by the lender it would be paid, we assume, by the insurance company to the borrower. We do not say, in such case, that upon payment by the insur-

ance company to the lender and the consequent discharge of the borrower's debt, that there may not come into existence a right on the part of the borrower to have the then unearned interest rebated or repaid. We have no such question before us. We do say that in a criminal case based upon alleged improper and illegal charges against the borrower that such improper charges are not shown by the foregoing facts. Charges which are proper and unexceptionable at the time of their being made can not become, by subsequent events, so illegal as to have constituted a crime at the inception of the contract. 27 R. C. L. 208; *Cooke v. Young*, 89 *S. C.* 173. 71 *S. E.* 837; *Barringer v. Jefferson Standard Life Ins. Co.*, (*D. C.*) 9 *Supp.* 493; *Grall v. San Diego B. & L. Ass'n*, 127 *Cal. App.* 250, 15 *P. 2d* 797; *Cissna Loan Co. v. Gawley*, 87 *Wash.* 438, 151 *P.* 792, *L. R. A.* 1916*B*, 807, *Ann. Cas.* 1917*D*, 722.

As to indictment No. 58, we think the motion for a directed verdict should be granted and a verdict of not guilty entered.

Indictment No. 62, May T. 1940.

This indictment, inter alia, charges that the defendant loaned to Bart Strazzella $278.87, to be repaid in 18 monthly payments, but that the note taken was for $361.62, and the monthly payments were $20.09 each, and that the defendant accepted a lien upon a Chrysler automobile as security for the loan. The indictment also shows that at the time of the application that Strazzella had insurance upon his automobile with the usual coverage commonly known as "comprehensive" fire, theft, fifty-dollar deductible collision insurance, towing and emergency service but that, as a condition to making the loan, the defendant required Strazzella to cancel the existing policy and to permit the defendant to procure a new policy, and that the defendant purported to advance $40.50 as a premium therefor.

The indictment also alleges that the defendant charged Strazzella the sum of $3.50 for notary and recording fees in transferring the title of the automobile and securing the lien thereon, and included said sum in the note for the loan.

An agreed statement of facts and a "breakdown" of the charges clearly present the issues. The agreed statement as to the insurance shows that the defendant (the lender) procured for the borrower an insurance policy from a certain company at the manual insurance rates, which were the same for borrowers or non-borrowers; that at the end of each month the insurance company billed the defendant for payment of all premiums for insurance written by it during such month at the actual manual rates charged the borrower, and that thereafter the defendant (lender) paid to the insurance company the amount of such premiums less a commission of not less than 25%, and that the lender received no additional commissions or compensation as to such insurance.

RODNEY, J., delivering the opinion of the Court:

From the foregoing facts there is presented the propriety of the following charges:

1. The sum of $3.50, representing $1.50 for transfer of title; $1.00 for recording conditional sale contract and $1.00 for four notary fees.

2. The amount of $40.50 required as insurance premium on the automobile taken as security for the loan with especial reference to the fact that at the time of the application insurance already existed on said car of the same nature and kind as charged for by the lender.

1. It is contended by the State that the imposition of $3.50 for notary fees and recording charges are illegal under the Act which, after allowing for interest in

advance and a service charge of 2% provides that no "additional charge of any kind" shall be made. We do not think this charge is a violation of the statute. The Act in providing for the loan allows the lender to take the obligation of the borrower "with any security that may be acceptable to the lender." The Act thus clearly recognizes the existence of security. An unnotarized or unrecorded conditional sale contract is no security, and the instrument becomes security only when recorded. We think, therefore, that the actual notary fees required for the recording of a paper when used as security, and the actual recording fees of an instrument creating the security of the lender are proper charges against the borrower. We are not unmindful that in *Davis Loan Co. v. Blanchard,* 14 *La. App.* 671, 676, 129 *So.* 413, 130 *So.* 472, notary fees were held unlawful under a statute resembling the 4th draft of the Uniform Act. The Court seems to have placed reliance upon the fact that the notary fees were in connection with a chattel mortgage which the Court said was otherwise invalid and which was not recorded and therefore not considered as security for the loan. That this was the real holding of the case is shown by the fact that on rehearing (130 So. 472) the majority of the Court held that the opinion had gone further than the facts required, although the rehearing was denied. The same Court again considered the Davis case in *Automobile Sec. Corporation v. Randazza,* 17 *La. App.* 489, 135 *So.* 45, 46. It is there said of the Davis case, "but that opinion did not become final. The decree was finally concurred in by all of the members of the court for the reasons that the facts of that case showed that the chattel mortgage had been executed not for the purpse of creating a real security, but solely for the purpose of furnishing a subterfuge under which an additional fee for passing the mortgage might be exacted * * *."

In *Com. v. Pennsylvania Loan Corporation*, 127 *Pa. Super*. 253, 193 *A*. 141, under an Act approximating the terms of the Uniform Act, the Court held that Prothonotary's fees and Court costs were not a violation of the Small Loan Act, 7 P. S. Pa., § 751 et seq., but were proper charges.

2. In the former opinion as to Indictment No. 58 we have indicated our views as to the propriety of requiring the borrower, under certain circumstances, to pay the premium for insurance on the property offered as security for the loan. The facts of the present case, however, do not come within the allowable limits we have outlined. The indictment and agreed facts show that the borrower, at the time of application for the loan, had existing insurance of precisely the same kind as subsequently obtained, which existing policy he was forced to cancel as a condition to the granting of the loan. It is common knowledge that such cancellations do not result in the return of the full proportionate part of the premium, and this loss fell upon the borrower. We repeat that we do not say that a lender may not exercise supervision of the character of the insurance or the strength and stability of the insurer. A lender need not accept an insurance policy which by reason of insolvency or weakness of the insurer does not insure. No suggestion is made that the forced cancellation was for any such reason. A new policy was written upon which the lender obtained a commission. The borrower was compelled, as a condition to the loan, to cancel the existing policy and take out the new one, on which these commissions were obtained. It is true that the borrower paid only the standard manual rate, being the same to borrowers and non-borrowers, but the important thing is that the lender from the new and forced insurance made an additional profit which he would not have made except for such compulsion, and that by reason of the cancellation of the

old policy and the payment of the new premium the borrower paid an additional amount. We think the new policy was not obtained as security for the loan, but as an extra charge. No form of innocent appearance will be allowed to disguise an usurious intent. The law will disregard all appearances and appraise the transaction in the light of its essential nature. *Hance Hardware Co. v. Denbigh Hall, Inc.*, 17 *Del. Ch.* 234, 152 *A.* 130.

As to this indictment we refuse the motion for binding instructions for the defendant and find the defendant guilty.

The remaining two indictments, Nos. 57 and 63, either present no questions not heretofore considered as grounds for binding instructions for defendant, or present fatal variances between the indictments and the agreed statement of facts of such a nature as to preclude any convictions under said indictments. In these two indictments, therefore, the motion for binding instructions will be granted and verdicts of not guilty entered.