COLUMBIA AUTO LOAN, Inc. v. DISTRICT OF COLUMBIA.

No. 995.

Municipal Court of Appeals for the District of Columbia.

Argued Jan. 7, 1951.

Decided Feb. 26, 1951.

Rehearing Denied March 14, 1951.

Samuel F. Beach, Washington, D. C., with whom Leslie C. Garnett and Bernard Margolius, Washington, D. C., were on the brief, for appellant.

Chester H. Gray, Principal Asst. Corp. Counsel, Washington, D. C., with whom Vernon E. West, Corp. Counsel, and Milton D. Korman and Clark F. King, Asst. Corporation Counsel, all of Washington, D. C., were on the brief, for appellee. Edward A. Beard, Washington, D. C., also entered an appearance for appellee.

Before CAYTON, Chief Judge, and HOOD and CLAGETT, Associate Judges.

CLAGETT, Associate Judge.

Columbia Auto Loan, Inc., trading as Columbia Credit Company, through its president, Samson Dewey Gottlieb, was convicted and fined under Code 1940, § 26–601, which makes it unlawful "to engage in the District of Columbia in the business of loaning money upon which a rate of interest greater than six per centum per annum is charged on any security of any kind, direct or collateral, tangible or intangible, without procuring license". It was stipulated that defendant was engaged in the business of lending money and also that it was not licensed under the so-called Small Loan Act, under which rates higher than 6% may be charged. Therefore the principal issue both in the trial court and here was whether defendant charged borrowers more than 6% interest.

Involved in the original information were three specific loans on used automobiles, but, for reasons not germane to this appeal, one of the cases was eliminated. Of the remaining cases one involved a loan to Peter Bunn of $150. This loan was made May 26, 1950. As evidence of this indebtedness Bunn was required to deliver to defendant his promissory note secured

by a chattel deed of trust in the amount of $250, payable in 10 installments of $25 each. The other case involved an alleged loan to Joshua Reed made May 27, 1950, in the amount of $198.28.[1] As evidence of this indebtedness, Reed was required to deliver to defendant his promissory note secured by a chattel deed of trust in the amount of $300, payable in 10 installments of $30 each. The notes in both cases were written to include interest until paid, but the rate of such interest was left blank. The chattel deeds of trust securing the notes contained provisions that upon default of any installment (which included insurance charges) the entire amount of the notes (including the insurance premiums) would become due. Since such monthly payments, including the repayment of principal, obviously would equal more than 6% per annum on the amount loaned, the issue was narrowed to whether and to what extent such payments included legal, or indeed any, charges for insurance.

Defendant's ordinary method of doing business as described by its president Gottlieb was as follows: When a person applied to it for an automobile loan ($150 in the Bunn case) and the loan was to be repaid in 10 months, the company took the sum necessary to repay the principal and interest in 10 months ($150 principal plus $3.75 interest in the Bunn case)[2] and added thereto a sum representing "insurance" premiums for one year ($96.25 in the Bunn case), the total representing the face amount of the note and the chattel mortgage which the borrower was required to sign ($250 in the Bunn case). The total was divided by the number of months in which the loan was to be repaid (10 in the Bunn case), and thus the monthly payment ($25 in the Bunn case) was arrived at. The "insurance" was supposed to cover one year's premium on the actual cash value of the automobile, $25 deducti-

ble, including fire and theft, towing charges and collision. In the Bunn case, for example, at the time of obtaining the loan of $150, he was required to sign, in addition to the note and chattel deed of trust, a "loan and insurance application" authorizing Columbia Auto Loan, Inc., to cover the automobile with such insurance "as it may deem necessary," and also authorizing the company "to make payment covering the premium on any such insurance to such insurance agency or company that you [the company] may choose or make payments thereon on a monthly basis." [3]

The so-called insurance in these cases was claimed by the company to have been based upon an agreement between one Patchen, said to have recently left the employ of defendant company, and the American Title and Insurance Company, making Patchen a "policy-writing" agent of the insurance company. Under this agreement the agent Patchen would have the right to countersign automobile policies sent in advance and to "adjust" losses arising under policies. This agreement is referred to more fully below.

Fundamental to consideration of the present case were certain significant dates and also provisions of our Code relating to insurance agents. In addition to being licensed as insurance agents generally, certain "policy-writing agents" are authorized to be specially licensed for that purpose by the Superintendent of Insurance under Code 1940, § 35–1336, which also provides that the Superintendent shall first find that the agent is "competent and trustworthy" and that not more than 25% of his commission income from business to which the license applies will result from policies, the premium on which are paid or are to be paid in the manner set forth in paragraph (f) of section 35–1340. This subsection prescribes that such a license of a policy-writing agent may be revoked by the Su-

---

1. Testimony as to the amount loaned to Reed differed. For the purpose of this discussion, we accept the company's own figures.

2. Actually, the interest charge was figured on a 3% discount basis. Had it been figured on a "straight" 6% per annum interest basis, the interest charge for 10 months would have been $4.15.

3. Reed testified he was told he had no insurance. Bunn testified he had gotten no policy until about a month before the trial.

perintendent if he finds that the license "is being used primarily for the purpose of obtaining commissions on policies on which he, on his own account, pays or is to pay the premiums, or on which the premiums are paid or are to be paid by any person who receives or is to receive any benefit, direct or indirect, from the commissions obtained, or on which the premiums are paid or are to be paid by any partnership, association, or corporation of which he is a member."

It is noteworthy that Code 1940, § 35-1334, provides that no insurance contract of this nature shall be written unless it is countersigned by a person specially licensed for this purpose.

Previous to the dates mentioned in the present case, the Columbia Auto Loan, Inc., as agent had written automobile insurance through other companies. For example, Gottlieb, testifying regarding a previous arrangement his company had with another insurance company, said that the insurance company sent the defendant company, as agent, a bill for the premiums due every month, defendant company carried such accounts as bills payable, and then, exclusive of losses, "We got back 88% of what we paid in the previous month." Asked whether the securer of the loan got the benefit of such repayment of premiums, Gottlieb answered, "No". However, on the initiative of the Superintendent of Insurance, such policy-writing agency or agencies with defendant were cancelled and were not in effect on the date of the transactions here involved. In consequence of the cancellation of the other previous arrangements, the following new arrangement was made: Patchen, operating as the Patchen Insurance Agency, became sick in March 1950 and never operated personally after that time. He applied for a license as a policy-writing agent for the American Title and Insurance Company. On July 15, 1950, Patchen (who died in August 1950), then in a hospital in Philadelphia, executed a general power of attorney in favor of Gottlieb. On July 20, 1950, armed with such power of attorney, Gottlieb, using Patchen's name, executed "an agency agreement" authorizing Patchen to act as policy-writing agent for American Title and Insurance Company, acting through the American Plan Corporation. The agency agreement was specifically made subject to the laws of the District. It contained no provision making it retroactive. Since it was actually executed by Gottlieb, he knew that it contained a provision that it was subject to District laws. This agency agreement, although not executed until July 1950, was dated as of May 31, 1950. Patchen's alleged agency agreement with American Title and Insurance Company, thus signed through Gottlieb, was never approved by the Superintendent of Insurance. The Superintendent, without whose authorization the agency was illegal, was not even notified of its execution until July 21, 1950. Gottlieb obtained a rubber stamp purporting to represent Patchen's signature, and this rubber stamp was used by the employees of defendant company to countersign ostensible policies of insurance on automobiles with American Title and Insurance Company, although neither Patchen nor Gottlieb was licensed as a policy-writing agent. For example, such an ostensible policy with American Title and Insurance Company was written in the name of Reed, one of the borrowers in the present case. The Bunn policy was not put in evidence, but it obviously could not have been issued before July. The Reed policy, although purporting to cover the automobile with insurance from May 27, 1950, the date of the loan, to May 27, 1951, was countersigned in Patchen's name by the rubber stamp on July 29, 1950. It will be remembered that the so-called agency agreement with Patchen, although not actually made until July, did not even purport to be effective before May 31, 1950. Gottlieb testified that defendant company owed either to the insurance company or to the Patchen estate money on account of the premiums, but, even if this were true, defendant company retained the use of the so-called premium money and at the time of trial had not paid it. On this testimony the trial court held that defendant had engaged in the business of lending

money upon which a rate of interest higher than 6% was charged on security.

The argument in the trial court revolved largely around the question of whether, on the theory of estoppel, the American Title and Insurance Company would be liable on policies written when Patchen's alleged policy-writing agency had not been approved by the Superintendent of Insurance and particularly when Patchen's name was signed by Gottlieb's employees with a rubber stamp. That issue, however, is involved in one or more suits in the District Court of the United States for the District of Columbia and, as we see it, is not before us. However, in view of the date sequence mentioned above, we think there is substantial evidence in the record to support the view that when the loans were made there was no insurance at all with any insurance company on the automobiles involved in the present case. Therefore, at most defendant contracted with borrowers to make charges on its own account for such so-called "insurance" as a part of the charge for lending money.

■ "Interest" has been defined as the consideration paid for the use of money or for forbearance in demanding it when due. Penn Mutual Life Ins. Co. v. Commissioner of Internal Revenue, 3 Cir., 92 F.2d 962. Within a usury statute, "interest" has been defined as money payable for use of capital on loan of money, forbearance of debt, or penalty imposed for retention of money. Foley v. Flaherty, 278 Mass. 134, 179 N.E. 599.[4]

■ We think it clear that if no legal insurance is obtained on the automobile by the lending agency and a contract is executed under which a charge is exacted which would make the total more than 6% on the amount loaned even though part of the charge is called an "insurance premium," then the charge becomes one for the use or detention of money. This is interest and is unlawful if it exceeds the legal rate.[5]

■ A further argument made by defendant is that since two specific transactions only were proved this was not sufficient, within the meaning of the statute, to establish that the company was engaging in the business of loaning money upon which a rate of interest greater than 6% per annum was charged. It has been held single isolated acts do not constitute engaging in business.[6] Here, however, it was stipulated that defendant was engaged in the business of lending money and also that it was not licensed under the so-called Small Loan Act under which licensed individuals or companies are permitted to charge up to 1% per month on the actual amount of loans of less than $200.[7] How many times must a company break the law before it can be prosecuted? It was in evidence that defendant had written 137 "policies" under the Patchen arrangement before Patchen's death in August 1950. Under the circumstances we believe that two actual cases were enough. In view of the stipulations made and the proof of two overt acts of charges of more than 6%, we believe that the trial court was justified in its conclusion that defendant was, beyond a reasonable doubt, engaged without a license in the prohibited business.

Affirmed.

4. See Pacific Mutual Life Ins. Co. of California v. Goss, 5 Cir., 99 F.2d 658; Maryland Casualty Co. v. Omaha Electric L. & P. Co., 8 Cir., 157 F. 514; Eastern Mortgage & Securities Co. v. Collins, Tex.Civ.App., 118 S.W.2d 479; 66 C.J., Usury, § 109.

5. Missouri, K. & T. Trust Co. v. Krumseig, 172 U.S. 351, 19 S.Ct. 179, 43 L. Ed. 474; In re Graham, D.C.W.D.Ky., 22 F.Supp. 233; Annotation 21 A.L.R.

797, 878, et seq.; 66 C.J., Usury § 170. See Dickey v. Bank of Clarksdale, 183 Miss. 748, 184 So. 314; State v. Bankers Finance Corp., 2 Terry, Del., 566, 26 A. 2d 220.

6. Hartman v. Lubar, 77 U.S.App.D.C. 95, footnote 2, 133 F.2d 44, certiorari denied 319 U.S. 767, 63 S.Ct. 1329, 87 L. Ed. 1716. See Knott v. Jackson, D.C. Mun.App., 31 A.2d 662.

7. Code 1940, 26-605.